The CITY AND COUNTY OF DENVER, Acting By and Through Its BOARD OF WATER COMMISSIONERS, and the City and County of Denver, acting By and Through Its Department of Parks and Recreation, Applicant–Appellants/Cross–Appellees,

v.

CONSOLIDATED DITCHES COMPANY OF DISTRICT NO. 2, and the City of Englewood, Opposer–Appellees/Cross–Appellants,

and

The City of Thornton, acting By and Through Its Utilities Board, South Adams County Water and Sanitation District, North Fork Associates, Arapahoe Water and Sanitation District, the Union Ditch Company, the Godfrey Ditch Company, the Lower Latham Ditch Company, the Burlington Ditch, Land and Reservoir Company, the City of Lakewood, the State Engineer and the Division Engineer, Water Division No. 1, Opposers–Appellees.

No. 89SA345.

Supreme Court of Colorado,
En Banc.

Feb. 25, 1991.

As Modified on Denial of Rehearing
March 25, 1991.

Wayne D. Williams, Michael L. Walker, Henry C. Teigen and Casey S. Funk, Denver, for applicant-appellant City and County of Denver, acting by and through its Bd. of Water Com'rs and its Dept. of Parks and Recreation.

Patricia L. Wells, City Atty., Denver, for applicant City and County of Denver, acting by and through its Department of Parks and Recreation.

Davis, Graham & Stubbs, Bennett W. Raley, Max A. Minnig, Jr. and Alison L. Taylor, Parcel, Mauro, Hultin & Spaanstra, P.C., William A. Hillhouse, II, Denver, for Consol. Ditches Co. of Dist. No. 2.

Gale A. Norton, Atty. Gen., Timothy M. Tymkovich, Sol. Gen., and Bradley W. Cameron, Asst. Atty. Gen., Denver, for the State and Div. Engineer, Water Div. No. 1.

Justice QUINN delivered the Opinion of the Court.

This appeal is a sequel to our decision in *City and County of Denver v. Fulton Irrigating Ditch Co.*, 179 Colo. 47, 506 P.2d 144 (1972), which involved a 1940 agreement between the City and County of Denver, acting by and through its Board of Water Commissioners, and several ditch companies using water in the South Platte River Basin. Under the 1940 agreement, Denver agreed to cease using effluent from transmountain water diverted from the Colorado River System and used in its municipal water system in lieu of making evaporation releases from certain streambed reservoirs in the South Platte River Basin. In the instant case, Consolidated Ditches raised the 1940 agreement in opposition to Denver's application for approval of a plan for augmentation with respect to alluvial wells used to irrigate two of Denver's municipal golf courses. Denver's plan for augmentation proposed to recapture from its sewage treatment plants a portion of effluent attributable to water derived from Colorado River sources. The water court upheld the validity of the 1940 agreement and concluded and decreed, in pertinent part, as follows: that the 1940 agreement was not void as against public policy; that the 1940 agreement permitted Denver to "reuse, successively use and dispose of all return flows of water derived from Colorado River sources for all purposes for which said waters were decreed, which have appropriation dates subsequent to May 1, 1940, or which were acquired by the [Denver Board of Water Commissioners] subsequent to May 1, 1940"; that the 1940 agreement precluded Denver from reusing, successively using, or disposing of all return flows of water derived from Colorado River sources "pursuant to water rights with appropriation dates preceding May 1, 1940, whether those rights be conditionally or absolutely decreed, unless such rights were acquired by the [Denver Board of Water Commissioners] subsequent to May 1, 1940"; that the 1940 agreement also precluded Denver from reusing, successively using, or disposing of return flows from water derived from the Williams Fork River pursuant to water rights owned by Denver's Department of Improvements and Parks on May 1, 1940; and that the 1940 agreement would terminate if state water officials made an order requiring Denver to make evaporation releases from Antero, Eleven Mile Cañon, or Cheesman Reservoirs in the South Platte River Basin.

Denver appeals from that part of the judgment and decree upholding the validity of the 1940 agreement and precluding Denver from reusing, successively using, or disposing of effluent return flows from Colorado River sources. Consolidated Ditches, in turn, appeals from that part of the judgment and decree which holds that the 1940 agreement will terminate in the event water officials issue an order requiring Denver to make evaporation releases from any of the three streambed reservoirs in the South Platte River Basin. We affirm that part of the judgment and decree which upholds the validity of the 1940 agreement and which precludes Denver from reusing, successively using, or disposing of effluent return flows derived from decreed water rights from Colorado River sources with appropriation dates preceding May 1, 1940. We reverse that part of the judgment and decree which holds that the 1940 agreement will terminate upon the issuance of an order requiring Denver to make evaporative releases from any of the three streambed reservoirs in the South Platte River Basin.

## I.

A detailed statement of the facts leading up to the judgment and decree in this case is necessary to a complete understanding of the issues before us. By May 1, 1940, the date of the agreement which is central to this case, the City and County of Denver (Denver), acting by and through its Board of Water Commissioners (Denver Water Board), had developed an extensive and complex water supply system. This system included storage rights in three streambed reservoirs—Cheesman, Antero, and Eleven Mile Cañon Reservoirs—in the South Platte River Basin on the eastern slope of the Continental Divide. Also included in Denver's water supply system were transmountain diversions from the Fraser River Diversion Project and the

Williams Fork River Diversion Project. The Fraser River and the Williams Fork River are tributaries of the Colorado River and are on the western slope of the Continental Divide. Both the Fraser River Diversion Project and the Williams Fork River Diversion Project had been granted appropriation dates of July 4, 1921, by a decree entered on November 5, 1937. Diversions from the Fraser River were directed by the Denver Water Board, and the water was used primarily for general municipal purposes. The Williams Fork River Diversion Project was owned by Denver's general city government, and diversions from the Williams Fork River were used primarily for the dilution of sewage. On May 1, 1940, the same day on which the contract underlying the present controversy was executed, Denver granted the Denver Water Board "the perpetual right to use so much as may be desired by the Board of the water stored or to be stored in Williams Fork Reservoir," and later, in 1955, transferred ownership of the Williams Fork Diversion Project to the board.

By the year 1940, Denver had been operating its municipal water system by diverting approximately 38,672 acre-feet of water from the Colorado River Basin—approximately 29,200 acre-feet from the Fraser River Diversion Project and the balance from the Williams Fork River Diversion Project. The 38,672 acre-feet of imported water resulted in 12,506 acre-feet of effluent return flow, and the estimated evaporation losses from the three streambed reservoirs amounted to 10,142 acre-feet.[1] Thus, in 1940, the return flows exceeded the evaporation losses by 2,364 acre-feet.

Denver used some of the imported water directly and stored some of the balance in the three streambed reservoirs on the South Platte River by means of exchanges. Denver operated the streambed reservoirs according to a "gauge height" method.

1. Although evaporation losses from the three streambed reservoirs were not calculated in 1940, they have since been calculated to have been 10,142 acre-feet. This calculation was based on a comparison of records of reservoir contents in 1940 and a study conducted by the

United States Geological Survey in cooperation with the Denver Water Department on reservoir evaporation. *See* N. Spahr and B. Ruddy, *U.S. Geological Survey*, "Reservoir Evaporation in Central Colorado," Water–Resources Investigations Report, 83–4103 (1983).

Under this method, the water flowing out of the reservoir equalled the water flowing into the reservoir, and the water stored in the reservoir was maintained at a steady gauge level. The "gauge height" method, however, failed to take into account water loss due to evaporation and, at the time of the 1940 agreement, no adjustments or releases of water were made in order to offset evaporation losses in the reservoir. When the "gauge height" method was utilized in 1940, there was no statute or decisional law charging the reservoirs with liability for evaporation losses. Although Denver and downstream appropriators on the South Platte River were aware that such evaporation occurred, no precise method existed for determining the amount of evaporation losses. Consequently, the burden of evaporation losses was borne by downstream senior appropriators, such as the members of Consolidated Ditches Company of District No. 2 (Consolidated Ditches), with priority dates ranging from 1860 to 1894. Prior to May 1, 1940, the date of the agreement in question, downstream senior appropriators were also concerned about Denver's recapture of transmountain effluent from Colorado River sources for reuse or successive use in its municipal water system. This concern over evaporation losses and Denver's disposition of recaptured effluent from its sewage treatment plant ultimately led to the agreement of May 1, 1940, between Denver and Consolidated Ditches.

The agreement of May 1, 1940, was intended to settle and determine all differences between Denver and Consolidated Ditches over evaporation losses from the three streambed reservoirs. The agreement was executed by the City and County of Denver, acting by and through the President of the Denver Board of Water Commissioners, and fifteen ditch companies consolidated under the name and management of Consolidated Ditches.[2] Pursuant to the agreement, Denver and the other signatories agreed that the Eleven Mile Cañon Reservoir would be operated on an in-out flow basis measured by flumes without reference to gauge height and that "[a]ll streambed reservoirs now owned or operated by the City and County of Denver other than Eleven Mile Cañon Reservoir shall be operated according to the practice used since their inception, that is on the basis of gauge-height." The agreement also provided, in pertinent part, as follows:

It is understood and agreed that the City and County of Denver may make or permit any nonconsumptive use of water to create electric power, to dilute sewage, or the like while such water is on its way to its place of principal and ultimate beneficial use; and the City agrees that it will not use or attempt to use or lease any water, irrespective of source, which shall have been once used through its municipal water system and such water shall be allowed to become part of the nearest convenient natural water course.

\*   \*   \*   \*   \*   \*

If any substantial part of this agreement shall become impossible of performance by reason of enforcible [sic] order of governmental authority, the entire agreement shall then terminate and, as of that date, all parties be restored to their former status exactly as if the agreement had never been made.

When the agreement was executed in 1940, and for several years prior thereto, there had been considerable thought given to the development of the Blue River, which is also a tributary to the Colorado River on the western slope of the Continen-

---

2. Section 7-42-110, 3A C.R.S. (1986), provides as follows:

Companies organized under the laws of this state holding ditches or canals by virtue of their organization, which derive their supply of water for their respective ditches or canals from the same head gate or the same source of supply, may consolidate their interests and unite their respective companies under one name and management by filing a certificate of that fact in the office of the secretary of state and a counterpart thereof in the office of the recorder of the counties in which such ditches or canals are situated. The certificate shall be signed by the presidents of the companies so uniting with the common seals of the companies affixed thereto, and shall set forth the fact of such union of interests, and give the name of the new company thus formed.

tal Divide, as a potential source of water to meet Denver's ever growing needs. Irrigators in the South Platte Valley below Denver also considered the Blue River as a potential source for additional water to meet their needs. Subsequent to the 1940 agreement, Denver continued to develop and expand its water supply system and in 1954 was decreed water rights in the Blue River, with a priority date of June 24, 1946. *See City and County of Denver v. Northern Colorado Water Conservancy District*, 130 Colo. 375, 276 P.2d 992 (1954). In 1955, the United States District Court for the District of Colorado upheld Denver's rights in the Blue River. *United States v. Northern Colorado Water Conservancy District* (Consolidated Civil Case Nos. 2782, 5016, 5017, October 12, 1955) (hereinafter referred to as the Blue River Decree). Pursuant in part to a stipulation of the parties to that action, the Blue River Decree stated that Denver, as an appropriator of water from the Colorado River sys-

tem, which includes the Blue River, will undertake to use and make successive use of return flow from its municipal use of such water in order to reduce the heavy burden on the Blue River. The decree further provided that Denver, in order to accomplish that objective, "undertakes to exercise due diligence, within legal limitations and subject to economic feasibility." [3] Denver began importing Blue River water in 1964 through the Roberts Tunnel.

In 1965 the Colorado General Assembly added subsection (5) to section 148–7–17, C.R.S.1963 (1965 Perm.Supp.). This subsection, which is presently codified at section 37–84–117(5), 15 C.R.S. (1990), states in relevant part as follows:

Upon order of the state engineer there shall be released from the water in storage in each stream bed reservoir such quantities of water as, in the determination of the state engineer, are necessary to prevent evaporation from the surface of such reservoir from depleting the nat-

3. The Blue River Decree provided, in relevant part, as follows:

(e) To the extent that the importation and the use of water from the Colorado River System, over and above the quantity of water diverted from that source during the last year being October 1st, 1954 to September 30, 1955, by reason of the return flow from the municipal systems of said cities [the City and County of Denver and the City of Colorado Springs] increase the amount of water said cities may lawfully utilize from all sources in order to supply their municipal needs, through exchange or otherwise, to that same extent the right to divert water from the Blue River shall be correspondingly decreased, if such exchange is not exercised; provided, however, that the obligation to utilize water from the Colorado River System by exchange or otherwise shall be subject to the conditions, limitations, and safeguards as set forth in the following subdivision, the same being subdivision (f) of this paragraph.

(f) In order to accomplish the objectives set forth in the immediately preceding subdivision hereof, the same being lettered (e), each city undertakes to exercise due diligence, within legal limitations and subject to economic feasibility. To that end, the City and County of Denver and the City of Colorado Springs shall, respectively, submit to the Secretary of the Interior on or before December 31st of each calendar year, beginning with the year 1957, a report showing by months for the water year ended September 30th last past,

the quantities of water diverted by the reporting city from the Colorado River System, and whether and to what extent such water was used directly or placed in storage. After each city commences use of Blue River water said report shall also show by months for the same period the quantities of return flow from their municipal uses of such Colorado River water accruing to the South Platte River and to Fountain Creek, respectively, as measured at the gauging stations provided for herein. Each such report shall also show what steps, by legal action or otherwise, the reporting city has taken during the period covered by the report to utilize such return flow by exchange or otherwise to the extent water of the Colorado River System is included therein, so as to reduce or minimize the demands of such city upon Blue River water. The United States of America reserves the right, at any time after use of Blue River water commences hereunder, to apply to this Court for injunctive or other remedial orders, suspending or proportionately reducing diversions or imposing conditions upon the taking of Blue River water by the particular city, if the United States shall establish as a fact that the particular city has failed to exercise due diligence in taking, with respect to return flow of water of the Colorado River System, all steps which, in view of legal limitations and economic feasibility, might reasonably be required of such city in establishing, enforcing, utilizing or operating a plan designed to accomplish said reduction by such city of its Blue River water use.

ural flow of the stream running through such reservoir which would otherwise be available for use by other appropriators.

On August 16, 1966, the Division Engineer for Irrigation Division No. 1 wrote a letter to the Denver Water Board in which the engineer requested Denver to release 4,688 acre-feet of water from Antero, Cheesman, and Eleven Mile Cañon Reservoirs to compensate for evaporation losses. The Denver Water Board responded to the letter on August 22, 1966, and explained that its decision to cease using return flows from transmountain water diversions, pursuant to the 1940 agreement, more than compensated for any evaporation losses. The Division Engineer took no further action after receiving the board's response.

Subsequently, in 1969, Denver and the Adolph Coors Company entered into a contract by which Denver agreed to exchange a small amount of its transmountain effluent to Coors. Denver agreed to deliver that transmountain effluent into the South Platte River on Coors' account, so that Coors could use this water to supply downstream calls from ditches on the South Platte River and withhold an equivalent amount of clean Clear Creek Water for general industrial uses at its brewery in Golden.

Denver and the Adolph Coors Company filed a declaratory judgment action in which they sought a declaration that Denver had the right to make a succession of uses within the South Platte River Basin of water derived from transmountain diversions and, further, that Denver had the right to dispose of part of the water derived from transmountain diversions to the Adolph Coors Company. *See City and County of Denver v. Fulton Irrigating Ditch Co.*, 179 Colo. 47, 506 P.2d 144 (1972). The defendants in *Fulton* were ten ditch companies, all of which had signed the May 1, 1940 agreement, and the Cache La Poudre Water Users Association, which intervened as a defendant. Of the ten defendant ditch companies in *Fulton*, nine are current members of Consolidated Ditches. The defendants raised the 1940 agreement as one of the defenses to the Denver–Coors Company contract. The trial court ruled that, contrary to Denver's arguments, the 1940 agreement had not been terminated by reason of the Division Engineer's letter of August 16, 1966, to the Denver Water Board and, further, that the 1940 agreement was not void and had not expired by its own terms. On appeal, this court resolved the issues in *Fulton* as follows:

We hold that Denver, in the absence of an agreement on its part not to do so, (1) may re-use, (2) may make a successive use of, and (3) after use may make disposition of imported water. Further, we affirm the trial court in its determination that, by reason of an agreement dated May 1, 1940 to which Denver is a party, Denver may not exchange water under the Coors agreement.

179 Colo. at 51, 506 P.2d at 146.[4]  In so holding, the court in *Fulton* expressly determined that the 1940 agreement had not been terminated by the 1966 letter of the Division Engineer, since the record showed that the state water authorities were satisfied with Denver's explanation of its method of compensating for evaporation losses and that Denver had not changed its practice. 179 Colo. at 63, 506 P.2d at 153. The *Fulton* opinion then, in dicta, pointed out two questions expressly left open. The first unanswered question was whether the 1940 agreement may become void as

---

**4.** *Fulton* defined "reuse," "successive use," and "right of disposition" as follows:

"Re-use" means a subsequent use of imported water for the same purpose as the original use. For example, this could embrace the treatment of sewage resulting in potable water which is re-cycled into the regular water system.

"Successive use" means subsequent use by the water importer for a different purpose. This includes the practice of the City of Auro-

ra and possibly other municipalities which treat sewage containing imported water for further use by the city for irrigation of public parks and facilities and for industrial uses.

"Right of disposition" means the right to sell, lease, exchange or otherwise dispose of effluent containing foreign water after distribution through Denver's water system and collection in its sewer system.

179 Colo. at 52, 506 P.2d at 146–47 (footnote omitted).

against public policy by reason of wastage. This court remarked, on that issue, that it could "visualize that the amount of foreign water returned to the river after use far exceeds the evaporative loss from Denver's streambed reservoirs" and that, to that extent, the excess of return flow over evaporative loss would "create a bonanza for [ditch companies diverting on the South Platte River] and other downstream users at the expense of Denver and Western Colorado." 179 Colo. at 63, 506 P.2d at 153. The court hastened to observe, however, that Denver had not requested a determination of whether the 1940 agreement "has become void as against public policy by reason of the wastage thereunder or perhaps for other reasons." 179 Colo. at 63–64, 506 P.2d at 153. The second question left open in *Fulton* was whether the 1940 agreement was applicable to water not yet appropriated at the time the agreement was made. 179 Colo. at 64, 506 P.2d at 153.

Subsequent to 1940, the period of highest importation of Colorado River water was from 1974 through 1982, when the Roberts Tunnel was in place.[5] The Roberts Tunnel is utilized to transport water from the Blue River system to the eastern slope. In 1978, the year of highest importation, Denver imported 224,240 acre-feet which resulted in effluent return flows of 74,110 acre-feet and evaporation losses from the three streambed reservoirs were estimated to be 13,911 acre-feet. Of the total of 224,240 acre-feet imported by Denver in 1978, 81,188 acre-feet came from the two diversion projects with appropriation dates prior to May 1, 1940, namely the Fraser River Diversion Project and the Williams Fork River Diversion Project. This 81,188 acre-feet amounted to slightly more than one-third of the 224,240 acre-feet of water imported from the Colorado River system in 1978.

In 1976 Denver began to make evaporation releases from the three streambed reservoirs on its own initiative. Three years later, in 1979, the two questions unanswered in *Fulton* became the center of controversy in the instant proceeding when the State Engineer sought an injunction against Denver to prevent the Denver Department of Parks and Recreation from appropriating groundwater from four alluvial wells for irrigation of the John F. Kennedy and Park Hill Golf Courses. By stipulation of the State Engineer and Denver, the water court entered a consent decree pursuant to which Denver agreed to augment the surface flow of the South Platte River, in an amount equivalent to the volume of groundwater depletion caused by the wells, by exchanging a portion of the transmountain effluent discharged into the South Platte River at the Denver metropolitan sewage plant until the development of a permanent augmentation plan. On December 31, 1981, Denver, acting by and through the Denver Department of Parks and Recreation, filed an application in the water court for approval of its plan for augmentation. The Denver Water Board, acting on behalf of Denver, subsequently intervened in the proceedings. Consolidated Ditches opposed Denver's application on the basis of the 1940 agreement.[6] Subsequent to Denver's filing of its application for approval of the plan for augmentation and prior to the trial of this case, the State Engineer requested Denver in 1983 to supply information concerning the evaporation losses in the three streambed reservoirs. The engineer, however, took no action to require Denver to make any corresponding releases from the reservoirs.

---

5. The total importations from 1974 through 1982, with the Roberts Tunnel in place and through which water from the Blue River collection system was transported to the eastern slope, were as follows: 1974, 111,640 acre-feet; 1975, 109,480 acre-feet; 1976, 134,330 acre-feet; 1977, 158,538 acre-feet; 1978, 224,240 acre-feet; 1979, 111,268 acre-feet; 1980, 104,830 acre-feet; 1981, 166,730 acre-feet; 1982, 138,308 acre-feet.

6. The City of Englewood filed a statement of opposition to Denver's application for approval of an augmentation plan, and also filed a notice of a cross-appeal in this court. It later filed a notice of intent not to file a brief in support of its cross-appeal. Although several other parties also filed statements of opposition to Denver's application in the water court, only Consolidated Ditches has filed a brief in this court.

The trial of this case commenced in June 1986, and the water court entered a final judgment and decree on April 12, 1989. The water court initially entered an extensive ruling addressing the issues before it. It concluded that the principal purpose of the 1940 agreement "was to eliminate the burden on [the South Platte River] caused by evaporation from the streambed reservoirs." That objective, according to the water court, "will be achieved by limiting the effect of the 1940 agreement to waters which were appropriated at the time it was executed" and by construing the agreement as not applying to waters appropriated by Denver subsequent to May 1, 1940. The court remarked in this respect as follows:

In 1940 the parties were considering a joint development of Blue River resources. It must have been evident to all concerned that if these plans were carried through, large quantities of water would be available for importation into the South Platte basin. The quantity of water potentially available for reuse would be greatly increased. There is no reason to believe that Denver would intend to confer such a potential bonanza upon Consolidated Ditches. It is also unlikely that Consolidated Ditches would have taken a position which would make it less attractive for the cities involved— including Denver—to participate in the joint development which was anticipated.

The amount of evaporation from the streambed reservoirs would probably continue at about historic rates, yet it was likely that the importation of transmountain water would steadily grow. It seems dubious that Denver would agree—or Consolidated Ditches expect— that an ever increasing price be paid for a static benefit.

All told, the surrounding circumstances point to the fact that in entering the 1940 agreement the parties were attempting to solve the problem of evaporation as it existed at that time, and did not intend that the agreement should bind water appropriated in the future.

In the court's view, its interpretation of the 1940 agreement was fair to Denver be-cause "as long as the agreement is in effect Denver is relieved from its obligation to make evaporation releases on account of Antero, Eleven Mile Cañon, and Cheesman Reservoirs." The court also determined that its interpretation of the 1940 agreement was fair to Consolidated Ditches because "[t]heir right to South Platte water according to their decrees is untouched." The court recognized that Denver was in fact making evaporation releases from these reservoirs, but was not required to do so under the 1940 agreement and under the State Engineer's present policy. Although the transmountain effluent return flows, according to the court, "are generally somewhat greater than the evaporation losses from the streambed reservoirs, the divergence is not unreasonable," notwithstanding the fact that the divergence results in "somewhat of a bonus" to Consolidated Ditches. The court also concluded that its interpretation of the 1940 agreement "will still allow the purposes of the Blue River decree to be accomplished to the extent they are feasible."

After so ruling, the court decreed as follows: that the 1940 agreement, as interpreted by the court, was not void as against public policy; that the 1940 agreement had not been terminated; that the agreement did not prohibit the Denver Water Board from reusing, successively using, and disposing of return flows from water derived from Colorado River sources for all purposes with respect to decreed water rights with appropriation dates subsequent to May 1, 1940, or with respect to water rights which were acquired by the Denver Water Board subsequent to that date; that the 1940 agreement, unless and until it is terminated, prohibited the Denver Water Board from reusing, successively using, or disposing of return flows from water derived from Colorado River sources, pursuant to water rights with appropriation dates preceding May 1, 1940, whether those rights be conditionally or absolutely decreed, provided, however, that the Denver Water Board may not reuse, successively use, or dispose of return flows derived from water rights in the Williams Fork

River and its tributaries which were owned by the City and County of Denver, Department of Improvements and Parks, on May 1, 1940; and that if water officials issue orders requiring Denver to make evaporation releases, the 1940 agreement will terminate.

In appealing from the water court's judgment and decree, Denver argues that the 1940 agreement is facially void as against public policy and that, alternatively, the agreement has been terminated pursuant to its own terms. Denver also argues that, regardless of the facial validity or invalidity of the 1940 agreement, present circumstances render the agreement void by reason of wastage. Denver last claims that the 1940 agreement, if valid, should be limited in scope to water diverted from the Fraser River and its tributaries in 1940, because the Denver Water Board's rights in the Williams Fork River were not acquired from Denver until 1955. Consolidated Ditches, in its cross-appeal, contends that the water court erred in concluding that the 1940 agreement will terminate if water officials issue orders requiring Denver to make evaporation releases from the streambed reservoirs. Before considering the merits of these claims, we will address a preliminary matter which is closely related to some of the arguments raised by the parties.

## II.

The preliminary question relates to whether the doctrines of res judicata or collateral estoppel apply to any of Denver's claims by reason of our prior decision in Fulton, 179 Colo. 47, 506 P.2d 144. Consolidated Ditches argues that the Fulton decision established the validity and enforceability of the 1940 agreement and that Denver is precluded from relitigating that question in this case.

■ The doctrine of res judicata, which is a form of claim preclusion, renders an existing judgment conclusive as to the rights of the parties or their privies in any subsequent proceeding based on the same claim. People v. Hearty, 644 P.2d 302, 312 (Colo.1982); Pomeroy v. Waitkus, 183

Colo. 344, 349–50, 517 P.2d 396, 399 (1973). Res judicata bars relitigation "not only of all issues actually decided, but of all issues that might have been decided." Pomeroy, 183 Colo. at 350, 517 P.2d at 399. Denver's claim in this case is clearly distinct from its claim in Fulton. The transaction in the Fulton case arose out of Denver's attempt to reuse transmountain effluent to replace water diverted by the Coors Company at the confluence of Clear Creek and the South Platte River. In the instant case, Denver's claim arose out of its attempt to reuse transmountain effluent to augment irrigation wells on golf courses. Under these circumstances, therefore, the Fulton decision has no res judicata effect on this case.

■ In contrast to res judicata, collateral estoppel bars relitigation of an issue when that issue has been determined at a prior proceeding under the following circumstances:

(1) the issue precluded is identical to an issue actually litigated and necessarily adjudicated in the prior proceeding; (2) the party against whom estoppel is sought was a party to or was in privity with a party to the prior proceeding; (3) there was a final judgment on the merits in the prior proceeding; and (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding.

Industrial Comm'n v. Moffat County School Dist. RE No. 1, 732 P.2d 616, 619–20 (Colo.1987) (footnote omitted); accord, People v. Allee, 740 P.2d 1, 5 (Colo.1987); Pomeroy, 183 Colo. at 350–51, 517 P.2d at 399. Denver, acting by and through its Board of Water Commissioners, was a plaintiff in the Fulton case. Although Consolidated Ditches was not one of the named defendants in Fulton, nevertheless when it signed the 1940 agreement Consolidated Ditches was a statutory "consolidated ditch company"—i.e., a company consisting of several ditch companies "which derive their supply of water for their respective ditches or canals from the same head gate or the same source of supply" and which "consolidate their interests and unite

their respective companies under one name and management." § 7–42–110, 3A C.R.S. (1986). The record shows that there were ten ditch companies named as defendants in the *Fulton* case. Of these ten companies, nine are currently members of Consolidated Ditches and one company is no longer an active member.[7] There is thus sufficient commonality of interest between Consolidated Ditches and the ditch companies named as defendants in the *Fulton* case to satisfy the privity requirement of collateral estoppel. To the extent, therefore, that any issue in the present litigation is identical to an issue previously resolved in *Fulton*, the doctrine of collateral estoppel would render *Fulton*'s resolution of that issue conclusive on the parties to the present controversy. With this preliminary matter aside, we turn to Denver's claims.

### III.

Denver argues that the water court erred in determining that Denver's water rights were subject to the prohibition in the 1940 agreement against Denver's use or attempt to use "any water, irrespective of source, which shall have been once used through its municipal water system." Denver claims that such prohibition is facially invalid as contrary to public policy because it creates a perpetual contract and it contravenes the long-standing goal of maximum beneficial use of water. We are unpersuaded by Denver's claims.

### A.

■ In *Cherokee Water Dist. v. Colorado Springs*, 184 Colo. 161, 519 P.2d 339 (1974), we upheld the validity of a contract for the sale of water to a municipality when the contract itself contained a perpetual option in favor of the municipality. We there stated:

Our constitution provides:

The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided. Colo. Const. art. XVI, § 5.

Our state grants the right to appropriators to the use of water *in perpetuity*. We can see no reason why the same rule should not apply here. Water is not a "sometime thing"—most usages of it are perpetual. Therefore, we hold that a contract for its use can be *in perpetuity*. 184 Colo. at 164–65, 519 P.2d at 341 (emphasis in original).

Denver's rights in water diverted from the Colorado River system had been granted in perpetuity, as had been Consolidated Ditches' rights in water diverted downstream from Denver in the South Platte River Basin, and both Denver and Consolidated Ditches at the time of the 1940 agreement obviously intended the agreement to operate in perpetuity. Because the precise issue raised here by Denver was not addressed or resolved by the *Fulton* decision, Denver is not collaterally estopped from litigating the perpetual term of the 1940 agreement. What was not addressed or resolved in *Fulton*, however, was later settled adversely to Denver's position when this court held in *Cherokee Water District*, 184 Colo. at 165, 519 P.2d at 341, that "[o]ur state grants the right to appropriators to the use of water *in perpetuity*," and, therefore, "a contract for its use can be *in perpetuity*" (emphasis in original).

### B.

■ We also reject Denver's claim that the 1940 agreement contravenes the public

---

7. The ten defendants in *Fulton* were: Fulton Irrigating Ditch Co.; New Brantner Extension Ditch Co.; Platteville Milling and Irrigation Co.; Brighton Ditch Co.; Beeman Ditch and Milling Co.; Farmers Independent Ditch Co.; Lupton Bottom Ditch Co.; Platte Valley Irrigation Co.; Union Ditch Co.; and Western Mutual Ditch Co. These ten defendants were signors of the May 1, 1940 agreement. Nine of the defendants in *Ful-*

ton are currently active members of Consolidated Ditches. Union Ditch Co. is no longer an active member of Consolidated Ditches. Consolidated Ditches currently has eleven member ditch companies, two of which—Meadow Island Irrigation Co., No. 1 and Lupton Meadows Ditch Co.—were original signors of the May 1, 1940 agreement, but were not named as defendants in *Fulton*.

policy of maximum beneficial use of water. Denver in part relies on various statutes in support of its claim. Two of the statutes restate the policy of maximum beneficial use, §§ 37–92–102(1)(a) and 37–92–501(2)(e), 15 C.R.S. (1990),[8] and several of Denver's other statutory references allude to the policy against wastage, §§ 37–45–102(1)(d), 37–82–106(1), and 37–84–117(5), 15 C.R.S. (1990).[9] Denver, however, has failed to show that the facial terms of the 1940 agreement frustrate the policy of maximum beneficial use by fostering wastage.

■ There can be no question that implicit in the law of vested rights is the proposition that "there shall be *maximum utilization* of the water of this state." *Fellhauer v. People,* 167 Colo. 320, 336, 447 P.2d 986, 994 (1968) (emphasis in original). The principle "that the right to water does not give the right to waste it" constitutes the foundation for any effective integration of maximum utilization with the law of vested rights. *Id.; see also* Colo. Const. art. XVI, § 6 (right to divert unappropriated waters of any natural stream to beneficial use shall never be denied); § 37–92–103(4), 15 C.R.S. (1990) (beneficial use is amount of water that is reasonable and appropriate under reasonably efficient practice to accomplish purpose of appropriation without waste). The policy of maximum beneficial use was no less dominant at the time of the *Fulton* decision than it is today. Indeed, one of the issues expressly determined in *Fulton* was the validity of

the "reuse" clause in the 1940 agreement, which is the very same clause on which Denver places reliance for its argument that the 1940 agreement violates the public policy of maximum beneficial use.

Given the dominant role played by the policy of maximum beneficial use in Colorado under law, there would have been no justification whatever for this court to uphold the validity of the "reuse" clause in *Fulton* if there had been the slightest suggestion that the prohibition of Denver's reuse, successive use, or post-use disposition of transmountain effluent from the Colorado River system somehow undermined that policy. Our decision in *Fulton* upholding the validity of the "reuse" clause is conclusive of Denver's challenge to the facial validity of that same clause in this proceeding.

### C.

■ As additional support for its argument that the 1940 agreement contravenes the policy of maximum beneficial use of water, Denver relies on the 1955 Blue River Decree, entered by the United States District Court for Colorado. The Blue River Decree stated, in pertinent part, that Denver, "within legal limitations and subject to economic feasibility," would undertake to exercise due diligence in accomplishing the objective of municipal reuse and successive use of Blue River water in order to reduce the demands upon the Blue

**8.** Section 37–92–102(1)(a) states that it is the policy of the State of Colorado that "all water in or tributary to natural surface streams ... [is] the property of the public, dedicated to the use of the people of the state," subject to appropriation and use in accordance with the Colorado Constitution and that the appropriation, use, and administration of underground tributaries to a stream shall be integrated with the use of surface water in such a way as to maximize the beneficial use of all waters of this state. Section 37–92–501(2)(e) states that any rules and regulations adopted by the state engineer "shall have as their objective the optimum use of water consistent with preservation of the priority system of water rights."

**9.** Section 37–45–102(1)(d) contains a legislative declaration that water conservation benefits municipalities. Section 37–82–106(1) authorizes

an appropriator lawfully introducing foreign water into a stream system from an unconnected stream system to make a succession of uses of such water by exchange or otherwise to the extent its volume can be distinguished from the volume of the stream into which the foreign water is introduced. Section 37–84–117(5) authorizes the state engineer to order evaporation releases from streambed reservoirs to offset the depletion of the natural flow of the stream caused by evaporation.

Denver also cites section 31–35–402(1)(f), 12B C.R.S. (1986), which grants municipalities the power to collect fees for water or sewer services, and section 31–12–121, 12B C.R.S. (1986), which provides for municipal water services outside incorporated boundaries. Denver, however, fails to explain how these statues relate to the public policy issue, raised in its brief, of maximum utilization of water.

River. When the Blue River Decree was entered in 1955, Denver's 1940 agreement already constituted a "legal limitation" on Denver's ability to reuse or successively use transmountain effluent from the Colorado River system. The "legal limitations" provision of the Blue River decree, therefore, expressly acknowledged the preexisting legal limitation which the 1940 agreement imposed on Denver's obligation under the Blue River Decree.[10]

## IV.

Denver next argues that the 1940 agreement was terminated pursuant to its own terms by reason of the provision stating that "[i]f any substantial part of this agreement shall become impossible of performance by reason of enforcible [sic] order of governmental authority, the entire agreement shall then terminate." Denver relies for its "contractual termination" argument on three separate events: the Division Engineer's 1966 letter to the Denver Water Board, in which the engineer requested the release of 4,688 acre-feet of water from the three streambed reservoirs to replace evaporation losses; Denver's action in 1976 in making evaporation releases from the streambed reservoirs; and the State Engineer's 1983 letter to the Denver Water Board, in which the engineer requested information regarding in-out flow, evaporation, and water elevations with respect to the three streambed reservoirs. We reject Denver's argument.

### A.

The issue of the effect of the Division Engineer's letter of August 16, 1966, to the Denver Water Board was fully litigated and resolved in *Fulton*. After pointing out

in *Fulton* that the water board replied to the Division Engineer's letter by stating that "return flows from our transmountain diversions more than offset such losses," 179 Colo. at 62, 506 P.2d at 152, this court stated:

There was testimony to the effect that the state water authorities were satisfied with Denver's explanation and method of compensating for evaporative losses. Denver has not changed its practice. The record fully supports the finding of the trial court that the [1940] agreement has not been terminated.

179 Colo. at 63, 506 P.2d at 153. Because this issue was actually litigated and determined against Denver in the *Fulton* case, it is conclusive of Denver's claim in the present matter regarding the effect of the Division Engineer's 1966 letter on the 1940 agreement.

### B.

With respect to Denver's commencement in 1976 of making evaporation releases from the streambed reservoirs, the record clearly shows, and the water court so found, that Denver's change in operation was a form of unilateral action taken by Denver on its own initiative and not in response to any order from the State Engineer or Division Engineer. In effect, Denver's claim amounts to an attempt to transform its unilateral action into an "enforceable order" for purposes of the termination clause of the 1940 agreement. Denver's contention is both factually unsupported and legally unsound.

### C.

Finally, we are unable to find any merit in Denver's assertion that the State Engi-

---

10. We acknowledge that this court in *Fulton*, 179 Colo. at 63–64, 506 P.2d at 153, in dicta, stated that if "the amount of foreign water returned to the river after use far exceeds the evaporative loss from Denver's streambed reservoirs," then the effect of the 1940 agreement would be "to create a bonanza for the defendants [ditch companies] and other downstream users at the expense of Denver and Western Colorado," and, in that instance, the agreement would run "contra to the portion of the Blue River [D]ecree mentioned earlier." 179 Colo. at

63, 506 P.2d at 153. As we have discussed in the text, Denver's obligations under the Blue River Decree were subject to "legal limitations," and one of the legal limitations was the preexisting legal limitation imposed on Denver by the 1940 agreement on its rights and duties with respect to reuse as determined in *Fulton*. Furthermore, as we also discuss in the text, we are not convinced, nor was the water court, that the effect of the 1940 agreement actually creates a "bonanza" for Consolidated Ditches and other downstream users on the South Platte River.

neer's 1983 letter to the Denver Water Board somehow terminated the 1940 agreement. Although Denver categorizes this letter as an "order," it was nothing more than a request for information and cannot be reasonably characterized as an "enforceable order of governmental authority" for purposes of the termination clause in the 1940 agreement.

## V.

■ Denver next contends that the presently existing disparity between return flows and evaporation losses from imported Colorado River system water with appropriation dates prior to May 1, 1940, renders the 1940 agreement void as against public policy by reason of wastage. Denver's claim is one of the issues left unanswered in *Fulton*. This court in *Fulton* stated in dicta that a substantial disparity between the amount of return flows from imported water and the evaporation losses from streambed reservoirs could "create a bonanza for the [ditch companies] and other downstream users at the expense of Denver and Western Colorado," but then noted that "[Denver] did not request ... a determination of whether the 1940 agreement has become void as against public policy by reason of the wastage thereunder or perhaps for other reasons." 179 Colo. at 63–64, 506 P.2d at 153. We are unconvinced of the ultimate merit of Denver's contention.

In *Fulton*, the Denver–Coors Company water exchange involved Denver's transmountain effluent and thus was subject to the 1940 agreement. The *Fulton* opinion made no distinction between Denver's water diverted from the Fraser River and the Williams Fork River, both of which involved water rights with appropriation dates prior to May 1, 1940, and water diverted from the Blue River, which involved water rights with an appropriation date subsequent to May 1, 1940. In contrast to *Fulton*, the water court in this case limited the 1940 agreement to waters appropriated prior to May 1, 1940, and then, after acknowledging that "the transmountain effluent return flows from the pre–1940 western slope appropriations are generally somewhat greater than the evaporation losses from the streambed reservoirs," determined that "the divergence is not unreasonable." We agree with the water court's resolution of this aspect of the case.

■ The evidence in this case established, and the water court so found, that Denver and Consolidated Ditches, in executing the 1940 agreement, were aware that the amount of evaporation from streambed reservoirs would probably continue at about historic rates, "yet it was likely that the importation of transmountain water would steadily grow." There was evidence in the record, and the water court again found, that in 1940 Denver imported 38,672 acre-feet from the Fraser River and Williams Fork River Diversion Projects. These importations resulted in return flows of 12,506 acre-feet of effluent and estimated evaporation losses of 10,142 acre-feet from the three streambed reservoirs. By comparison, there was evidence that in 1978, which was the year of highest importation, Denver imported 224,240 acre-feet from the Colorado River system, which resulted in return flows of 74,110 acre-feet and evaporation losses of approximately 13,911 acre-feet. Of the 224,240 acre-feet of transmountain water imported by Denver in 1978, only 81,188 acre-feet came from the Fraser and Williams Fork River Diversion Projects, both of which had appropriation dates prior to May 1, 1940, and 143,052 acre-feet, or almost two-thirds of the total transmountain importation, came from the Blue River Diversion Project, which had an appropriation date of June 24, 1946, and was not subject to the 1940 agreement. Thus, the amount of transmountain water in 1978 that was subject to the 1940 agreement, although approximately double the amount of transmountain water imported in 1940, accounted for only approximately one-third of the total 1978 importation. In light of the principal purpose of the 1940 agreement, which was to eliminate the burden on the South Platte River from evaporation losses, and in light of the fact that both Denver and Consolidated Ditches expected in 1940 that "the importation of transmountain water would

steadily grow" in future years, the water court was legally correct in concluding that the presently existing disparity between return flows and evaporation losses attributable to transmountain water with appropriation dates prior to May 1, 1940, is not unreasonable.

■ The water court's determination that the present disparity between evaporation losses and return flows is not unreasonable vitiates Denver's claim that the 1940 agreement is void as against public policy by reason of the wastage of water. In this connection we point out that the South Platte River is over-appropriated, which means that "in the irrigation season, except during storm and flood times, there is not enough water in the [river system] to satisfy all of the decreed surface appropriations." *Hall v. Kuiper*, 181 Colo. 130, 132, 510 P.2d 329, 330 (1973). Nothing in the record suggests that the return flows from the transmountain water encompassed by the 1940 agreement will not be put to maximum utilization either by Consolidated Ditches, its members, or some other senior appropriator on the South Platte River downstream from Denver. Because there is competent evidence in the record to support the water court's determination that the presently existing disparity between return flows and evaporation losses is not unreasonable, and because there is nothing to show that the court was not governed by proper rules of law, we will not disturb the water court's ultimate judgment in rejecting Denver's claim of wastage. *See, e.g., Colorado River Water Conservation Dist. v. City and County of Denver*, 640 P.2d 1139, 1143 (Colo.1982); *Farmers Reservoir and Irrigation Co. v. Town of Lafayette*, 93 Colo. 173, 177, 24 P.2d 756, 758 (1933); *Rogers v. Nevada Canal Co.*, 60 Colo. 59, 71, 151 P. 923, 928 (1915).

## VI.

Denver next argues that its water rights in the Williams Fork River are not subject to the 1940 agreement because those rights, as of May 1, 1940, were owned by the general municipal government of Denver, through its Department of Improve-

ments and Parks, which was not a signatory to the 1940 agreement, and that the Denver Water Board did not acquire title to those rights until 1955. We reject Denver's argument.

■ The 1940 agreement states that Denver "agrees that it will not use or attempt to use or lease any water, irrespective of source, which shall have been once used through its municipal water system." This language refers to Denver's use of water, and not necessarily to its ownership of such water. In addition, the contract was signed by the Denver Water Board on behalf of the general municipal government of Denver. The provisions of the Denver Charter in effect in 1940 vested the Denver Water Board with "all the powers of the city and county granted by the constitution and laws of the state of Colorado and by the charter, in the matter of purchasing, condemning and purchasing, acquiring, constructing, leasing, extending and adding to, maintaining, conducting and operating a water works system and plant for all uses and purposes, and everything necessary, pertaining, or incidental thereto." Denver Municipal Charter art. XIX, § 297B (1953). The Denver Water Board, therefore, clearly had authority to execute the 1940 contract on behalf of the general municipal government of Denver. Furthermore, on May 1, 1940, the same day on which Denver's agreement with Consolidated Ditches was executed, the general municipal government of Denver, through its Department of Improvements and Parks, was the record owner of the Williams Fork River Diversion Project and granted the Denver Water Board the perpetual right to use as much water from the project as the board desired. These factors totally dispel Denver's claim that its water rights in the Williams Fork River are not subject to the 1940 agreement.

## VII.

The final issue in this case, which Consolidated Ditches raises on cross-appeal, is whether the water court erred in ruling that the 1940 agreement will terminate in the event "water officials decide to issue

orders requiring evaporation releases." Consolidated Ditches argues that the issue of a prospective termination predicated on future circumstances was not before the water court and that, consequently, the water court's ruling on that issue constitutes an advisory opinion on a hypothetical state of facts. We agree with Consolidated Ditches' claim.

It is axiomatic that "[c]ourts exist for the purpose of deciding live disputes involving 'flesh-and-blood' legal problems with data 'relevant and adequate to an informed judgment.'" *People v. Lybarger*, 700 P.2d 910, 915 (Colo.1985) (quoting *New York v. Ferber*, 458 U.S. 747, 767–68, 102 S.Ct. 3348, 3359–60, 73 L.Ed.2d 1113 (1982)). A court, therefore, should avoid an advisory opinion on an abstract proposition of law, particularly when the trial record is virtually devoid of any evidentiary basis for an ultimate legal conclusion. "Requiring a court to restrict its decision to those claims raised by the parties in the specific controversy enhances the prospect that any final judgment will proceed from a factual and legal analysis of the actual dispute presented to the court." *Lybarger*, 700 P.2d at 915; *see also People ex rel. Danielson v. Amity Mutual Irrigation Co.*, 668 P.2d 1368, 1370 (Colo.1983); *McKee v. City of Louisville*, 200 Colo. 525, 531, 616 P.2d 969, 973 (1980).

The plain terms of the 1940 agreement provide for termination only if "any substantial part of this agreement shall become impossible of performance by reason of enforcible [sic] order of governmental authority." Neither Denver nor Consolidated Ditches placed in issue the question whether a particular set of future circumstances might result in the termination of the 1940 agreement. The mere fact that a water official in the future might order Denver to make evaporation releases from any one or more of the streambed reservoirs might not necessarily result in "any substantial part" of the 1940 agreement thereby becoming "impossible of performance." The water court, therefore, erred in ruling that the 1940 agreement would terminate upon an order by a water official requiring evaporation releases.

### VIII.

In summary, we affirm that part of the judgment and decree which upholds the validity of the 1940 agreement and which precludes Denver from reusing, successively using, or disposing of effluent return flows derived from decreed water rights from Colorado River sources with appropriation dates preceding May 1, 1940, including return flows from the Williams Fork River. We reverse that part of the judgment and decree which holds that the 1940 agreement will terminate upon an order by a water official requiring Denver to make evaporation releases from any of the three streambed reservoirs in the South Platte River Basin.