Concerning the Application for Water Rights of the City of Aurora in Adams, Arapahoe, Douglas and Weld Counties

CITY OF AURORA, acting by and through ITS UTILITY ENTER-PRISE, Applicant–Appellee

v.

NORTHERN COLORADO WATER CONSERVANCY DISTRICT, Opposer–Appellant

and

East Cherry Creek Valley Water and Sanitation District, Opposer–Appellant.

Adams County Board of County Commissioners; Peter L. Baurer; Cynthia S. Baurer; Centennial Water and Sanitation District; Central Colorado Water Conservancy District, the Ground Water Management Subdistrict; Well Augmentation Subdistrict of the Central Colorado Water Conservancy District; City of Boulder; City of Brighton; City of Englewood; City of Fort Lupton; City of Greeley, acting by and through its Water and Sewer Board; City of Thornton; City of Westminster; Denis B. Clanahan, Trustee of the Crabb Trust; Colorado River Water Conservation District; City and County of Denver, acting by and through its Board of Water Commissioners; Carl F. Eiberger, III; Farmers Reservoir and Irrigation District; Henrylynn Irrigation District; New Brantner Extension Ditch Company; Donald O. Peterson; Public Service Company of Colorado d/b/a Xcel Energy; South Adams County Water and Sanitation District; The Brighton Ditch Company; United Water and Sanitation District; and Wattenberg Improvement Association, Inc.; Opposers–Appellees.

James Hall, Division Engineer, Water Division 1., Appellee Pursuant to C.A.R. 1(e).

No. 09SA158.

Supreme Court of Colorado, En Banc.

June 28, 2010.

As Modified Aug. 2, 2010.

Brownstein Hyatt Farber Schreck, LLP, Steven O. Sims, Adam T. DeVoe, John A. Helfrich, Holly K. Strablizky, Denver, Colorado, Attorneys for Applicant–Appellee City of Aurora.

Trout, Raley, Montaño, Witwer & Freeman P.C., Robert V. Trout, Bennett W. Raley, Douglas M. Sinor, Denver, Colorado, Attorneys for Opposer–Appellant Northern Colorado Water Conservancy District.

Ryley Carlock & Applewhite, William B. Tourtillott, Brian M. Nazarenus, James M. Noble, Denver, Colorado, Attorneys for Opposer–Appellant East Cherry Creek Valley Water and Sanitation District.

Ryley Carlock & Applewhite, Brian M. Nazarenus, James M. Noble, Denver, Colorado, Attorneys for Opposer–Appellee Public Service Company of Colorado, a Colorado corporation.

**Opinion modified, and as modified, Petition for Rehearing DENIED.**

Chief Justice MULLARKEY delivered the Opinion of the Court.

## I. Introduction

Opposers Northern Colorado Water Conservancy District ("Northern Water") and East Cherry Creek Valley Water and Sanitation District ("ECCV") appeal a May 6, 2009 decree of the district court, Water Division Number 1 (the "water court"). Northern Water claims that Aurora must discount any water from the Colorado–Big Thompson ("C–BT") Project that might flow through a proposed exchange reach when calculating that reach's exchange potential. ECCV contends that a 1976 contract with the City of Aurora does not allow the city to reuse all the effluent from sewage flows that ECCV sends to Aurora for treatment.

We affirm the water court in both instances. In the absence of a contract between Northern Water and Aurora, Northern Water cannot compel Aurora to discount any possible C–BT water in the exchange reach. ECCV's contract with Aurora allows the city to use all the effluent from sewage flows sent to it by ECCV.

## II. Facts and Procedural History

For much of the last decade, the City of Aurora has worked to obtain the necessary water rights for the implementation of its Prairie Waters Project (the "PWP"), an integrated water development project. For this third and final phase of the PWP Aurora seeks, among other things, appropriative rights of exchange on the South Platte River and an augmentation plan to replace out-of-priority depletions from the river.

Aurora's claimed appropriative rights of exchange on the South Platte involve diverting water for the city's use at specified exchange-to points on the river and replacing the water with a substitute supply at specified exchange-from points to satisfy the rights of downstream senior appropriators. The stretch of the South Platte over which these exchanges take place is called the exchange reach. One of the substitute water sources Aurora seeks to use for its augmentation plan is the effluent generated by sewage flows from ECCV, a water and sanitation district abutting Aurora. Aurora currently accepts sewage flows from ECCV and transports the flows through its sewage lines for treatment at the Metro Wastewater Reclamation facility and at Aurora's Sand Creek Wastewater Treatment Plant.

On May 6, 2009, the water court entered a final decree covering all aspects of this third phase of the PWP. Two opposers appeal two different aspects of the decree.

### A. Facts Pertaining to Northern Water

Northern Water is a water conservancy district organized under the Water Conservancy Act (the "WCA"), sections 37–45–101 to –153, C.R.S. (2009). Northern Water has authority to distribute water generated by the C–BT Project, which diverts water over the Continental Divide into the South Platte River basin for agricultural, municipal, domestic, and industrial uses. The C–BT Project was built in conjunction with the federal government in exchange for a promise to repay a portion of the costs to the United States. Northern Water's authority derives in part from the WCA and in part from the

terms of its contract with the federal government ("Repayment Contract"). Northern Water seeks to limit Aurora's appropriative rights of exchange on the South Platte River. It claims that Aurora will unlawfully benefit from the presence of C–BT water in the exchange reach. Northern Water has not quantified the C–BT return flows that are present within the exchange reach, and it does not dispute Aurora's showing that no Northern Water users will be injured by the exchanges. In a May 6, 2009 order the water court ruled that, in the absence of any allotment contract between Northern Water and Aurora, Northern Water cannot compel Aurora to discount any C–BT water present in the exchange reach when calculating the exchange potential. Northern Water appeals.

## B. Facts Pertaining to ECCV

In 1976, Aurora and ECCV entered into a contract pursuant to sections 32–1–301 to –308, C.R.S. (1973)(now codified at 32–1–501 to –503 (2009)), which permits municipalities and special districts to enter into agreements excluding land from the special district territory that is within the boundaries of both the special district and the municipality. One part of the contract stipulated that, in return for accepting and treating sewage flows from ECCV, Aurora could "recapture and reuse all effluent generated by sewage flows arising in the District and delivered to the Aurora system." Pursuant to this contract, Aurora has accepted all sewage delivered to its sewer system by ECCV regardless of the original source of water that generated the sewage. ECCV sends Aurora a monthly accounting of the sewage it delivers, but this accounting does not distinguish among the sources of the sewage. Nonetheless, ECCV claims that the 1976 contract does not provide a general allowance for Aurora to use all effluent generated by sewage flows from ECCV but only flows generated from water sources that were already active at the time the contract was made. The water court ruled that the language of the contract states that Aurora may use all the effluent from ECCV regardless of its source. ECCV appeals.

## III. Northern Water

### A. Standard of Review

■ We defer to the water court's findings of fact if they are supported by the record, and we review the court's legal conclusions de novo. *Cherokee Metro. Dist. v. Simpson,* 148 P.3d 142, 150 (Colo.2006).

### B. Analysis

■ Colorado water law states that, in addition to other elements, an applicant for an appropriative right of exchange must show that there is no injury to the water rights of others when implementing the exchange. *Empire Lodge Homeowners' Ass'n v. Moyer,* 39 P.3d 1139, 1155 (Colo.2001). Northern Water claims no injury to itself or its users from Aurora's proposed PWP exchange reach.

Despite this, Northern Water claims that, under the reasoning of *Thornton v. Bijou Irrigation Co.,* the combined effect of the WCA, the Repayment Contract, and Northern Water's own rules supersedes this general law and gives Northern Water the authority to deny any entity extra-district benefits from the use of C–BT water. 926 P.2d 1 (Colo.1996). Some amount of C–BT water flows through Aurora's proposed exchange reach outside the boundaries of the Northern Water district. Northern Water contends that the inclusion of this water in Aurora's calculation of the exchange potential of the exchange reach is prohibited and that the resulting larger exchange potential is an indirect extra-district benefit unlawfully derived from C–BT water.

In *Thornton,* the City of Thornton attempted to alter the use of C–BT units it acquired by virtue of its purchase of shares in the Water Supply and Storage Company ("WSSC"). *Id.* at 54. Prior to the Thornton acquisition, WSSC had entered into a contract with Northern Water for the use of those shares. *Id.* at 53–54. The contract with Northern Water specified that WSSC must "abide by the provisions of the Water Conservancy Act, the terms of the Repayment Contract, and the [Northern Water] rules." *Id.* at 54. Thornton sought to use

the C–BT water in areas within the Northern Water district but use it in such a way that it would have allowed other water shares to be diverted outside of the district that could not otherwise have been diverted. *Id.* Thus the C–BT shares, while remaining in the district, would be providing an indirect benefit to areas outside the district. *Id.* The *Thornton* court held that the WCA, Repayment Contract, and the Northern Water rules prohibited such an indirect benefit for a party in contractual privity with Northern Water to use C–BT water. *Id.* at 59.

■ The *Thornton* opinion discusses at length what is allowed and disallowed by the WCA, Repayment Contract, and the Northern Water rules. *Id.* at 55–59. In its brief in this case, Northern Water cites liberally to these sections, but it fails to acknowledge that the entire discussion occurs in the context of WSSC's—and by virtue of privity, Thornton's—contractual obligation to Northern Water. The restrictions of the WCA, Repayment Contract, and the district rules applied to Thornton not because they constitute a general law that Northern Water may enforce upon any party that might possibly touch C–BT water but because the allotment contract between WSSC and Northern Water subjected WSSC, and Thornton, to the restrictions.

As the court in *Thornton* stated, "Thornton's right to CBT water is derived solely and directly from the allotment contract executed between WSSC and [Northern Water]. As successor-in-interest to WSSC, Thornton can take no greater right to this water than the right held by WSSC under the terms of the Allotment Contract." *Id.* at 54. The court elaborated: "By the terms of the Allotment Contract between WSSC and the [Northern Water], to which Thornton became subject by virtue of its purchase of WSSC shares, Thornton agreed to be bound by the provisions of the Repayment Contract, the Water Conservancy Act, the [Northern Water] rules, and the Allotment Contract itself . . . ." *Id.* at 55–56. The *Thornton* court did hold that these laws and rules prohibit any extra-district indirect benefit from C–BT water but only for those who have contracted with Northern Water. The court empha-

sized that its analysis is contractual, not statutory:

> Where, as here, the scope of a water right is defined by contract, the general provisions of Colorado water law are not necessarily inapplicable, but their application is subject to the terms of the contract. . . . The injury determination contemplated by the exchange statutes is not applicable because the contract explicitly prohibits extra-district benefits regardless of injury. Were we to hold otherwise and approve Thornton's proposals, the effect would be to alter the terms of the parties' agreement and enlarge the benefits received by Thornton in excess of those for which it contracted. Given the clear contractual limitations on the scope of Thornton's CBT water right, we cannot apply conflicting statutory provisions to create a new contract between the parties.

*Id.* at 60 (citations omitted).

Northern Water claims no injury to its water rights from Aurora's proposed PWP exchange reach, and the *Thornton* holding prohibiting extra-district indirect benefits pertains only to parties that contract with Northern Water. Therefore, Northern Water cannot successfully petition the water court to impose a condition that excludes any possible C–BT flows in the exchange reach when Aurora calculates its exchange potential.

## IV. ECCV

### A. Standard of Review

■ The goal of contract interpretation is to give effect to the intention of the parties. *USI Props. E., Inc. v. Simpson,* 938 P.2d 168, 173 (Colo.1997). We ascertain the intent of the parties primarily from the language of the instrument itself. *Id.* In construing a document, we must not rewrite the provisions of an unambiguous document but must enforce an unambiguous contract in accordance with the plain and ordinary meaning of its terms. *Id.* Although ECCV argues that the terms of a water contract must be strictly construed in favor of the owner of the water rights (and therefore in favor of ECCV), the case it cites for that

proposition deals with a contract that was silent about the issue in dispute. *Pub. Serv. Co. of Colo. v. Meadow Island Ditch Co. No. 2,* 132 P.3d 333 (Colo.2006). Where, as here, the contract speaks directly to the right at issue we interpret the words of the document.

## B. Analysis

### i. The Contract

■ At issue in this dispute is the meaning of the word "district" in the 1976 contract between Aurora and ECCV. The last sentence of paragraph 9 contains the language at the crux of this dispute: "The District hereby grants to the city of Aurora for the full term of this agreement the right to recapture and reuse all effluent generated by sewage flows arising in the District and delivered to the Aurora system."

ECCV claims that "district" has two meanings within the contract, sometimes referring to ECCV as an entity and at other times referring to a specific area of land that is encompassed by the district. ECCV differentiates this specific area of district land from a larger "district service area" that ECCV also services. Under this reasoning, the first use of "District" in the sentence above ostensibly refers to the entity, while the second refers to the area of land. ECCV claims that Aurora may only use the effluent from sewage flows coming from the lands that were within the district in 1976, not the lands that were within the larger service area.

However, the third "whereas" clause of the 1976 contract shows this interpretation is wrong:

> Whereas, a portion of the lands in the District lie within the corporate boundaries of the City and a portion of said lands are without the corporate boundaries of the City, which lands include lands currently within the District, as organized, and lands described as being in a "Service Area" authorized to be served by the District
> . . . .

This paragraph, after dividing the lands of the district into two portions (those inside Aurora's boundaries and those outside), then describes what constitutes the land of the district. Starting with the words "which lands," a term that refers to "the lands in the District" mentioned at the beginning of the clause, the clause identifies the two areas that constitute the "lands in the District." This includes both "lands currently within the District," as well as "lands described as being in a 'Service Area' authorized to be served by the District." Therefore a straightforward reading of the contract shows that, because the district land includes both the district itself as well as the district service area, there is no distinction between the district and the district's service area; for the purposes of the contract they are the same. Once this meaning of "district" is properly understood, ECCV's claim that there is a difference between the "district" as an entity and the "district" as referring to certain lands falls apart. The "district" refers to the entity as a whole, and, because the lands of that entity include both the district itself and the larger service area, there is no distinction between the two uses of "district" in the final sentence of paragraph 9. The "district" is the entity, and the entity is both the district and the district service area. Therefore Aurora may, as the contract plainly states, use all of the effluent arising from any sewage flows that ECCV sends to Aurora from the district or the service area.

ECCV further contends, without textual support, that the only effluent to which Aurora is entitled comes from sewage flows that existed in 1976. If this were true the contract would have to read, "The District hereby grants to the city of Aurora for the full term of this agreement the right to recapture and reuse all effluent generated by *currently existing* sewage flows arising in the District and delivered to the Aurora system." The contract does not say this.

However, ECCV argues that the original understanding of the contract did not anticipate the new sources of water that ECCV would eventually use, resulting in greater sewage flows going into Aurora. It relies on a case, *Denver v. Consolidated Ditches Co. of District No. 2,* where the court decided that the intent of the parties to a 1940 contract

could not have been to allow Consolidated Ditches to gain an ever-increasing benefit at the expense of Denver, whose water rights remained static under the terms of the deal. 807 P.2d 23 (Colo.1991). However, that was a fact-specific inquiry in which one party, Denver, was trapped in a no-gain situation while the other, Consolidated Ditches, benefitted greatly as the years went on. This is not the case here. As ECCV transmits a greater sewage flow to Aurora, the city bears the increased expense of transporting it. Part of the payment for that expense, as negotiated in 1976, is Aurora's right to use the effluent from the sewage flows. It is true that Aurora's benefit is increasing but so is its burden. ECCV similarly benefits to an increasing degree as it offloads more sewage to Aurora.

Ultimately, the language of paragraph 9 is clear, and the basic principles of contractual interpretation dictate that we enforce the contract as written.

### ii. Rate-making and Exaction

ECCV argues that, even if the text allows Aurora to use all the effluent, that deal is either an unfair use of Aurora's rate-making power or is an illegal exaction, either one of which must be voided by this court.

 "Legitimate utility factors, and the justified use of governmental power, must be the basis for decisionmaking, and a judicial remedy is available by way of declaratory judgment action to redress rate-making actions which lack a rational relationship to the utility function of the governmental entity." *Bennett Bear Creek Farm Water & Sanitation Dist. v. Denver*, 928 P.2d 1254, 1273 (Colo.1996).[1] In addition, "rate making is a legislative function which involves many questions of judgment and discretion, [and] the utility methodology chosen by an entity empowered with rate-making authority will not be set aside unless inherently unsound." *Id.* at 1268. ECCV claims that because Aurora was fully compensated for its sewer

service independent of the reuse sentence of paragraph 9, there was no utility function being performed at all. However, the trial court found that ECCV provided no evidence to overcome its high burden of showing that the effluent provision was not rationally related to a governmental utility purpose. We defer to the trial court's evidentiary finding and affirm its holding that, assuming Aurora's effluent deal was a rate-making function, it was a legitimate use of rate-making authority.

ECCV also argues that paragraph 9 is an illegal exaction. We have held that a municipality cannot use its police power for bargaining purposes. *Town of Sheridan v. Valley Sanitation Dist.*, 137 Colo. 315, 324 P.2d 1038 (1958). In *Sheridan*, the town unlawfully used its police power to deny construction permits to a sanitation district in order to try to extract a deal for free sewer taps. There is no evidence that anything similar occurred in this case. Aurora did not use its police power to impose any requirement on ECCV before ECCV could use its land. The two parties conducted legitimate arms-length bargaining in negotiating a contract that was reviewed and found fair and equitable by the Arapahoe County District Court in 1977.

Finally, we affirm the trial court's determination that ECCV's request for a ruling concerning ECCV's power to terminate the 1976 contract is not ripe for decision.

### V. Conclusion

Aurora has no contract, and is not in privity, with Northern Water. Therefore the terms of the WCA, Repayment Contract, and Northern Water rules do not apply to Aurora. Northern Water may not require Aurora to discount any C–BT flows that run through the proposed PWP exchange reach from its calculation of the exchange potential.

ECCV's contract with Aurora unambiguously gives Aurora the right to use all effluent derived from sewage flows that ECCV sends to Aurora for treatment. The contract

---

1. We need not settle the question here of whether Aurora's sewage effluent agreement with ECCV is a proprietary action on the part of Aurora or a rate-making action because ECCV loses either way. If it were a proprietary action ECCV would certainly lose, as we would defer to the contract as it stands—"contracts cannot simply be abrogated, or ignored, and must be given effect in light of their essential purpose and effect." *Id.* at 1266.

does not constitute any unfair rate-making or illegal exaction.

We affirm the water court.

Justice HOBBS does not participate.