BENNETT BEAR CREEK FARM WATER AND SANITATION DISTRICT; Meadowbrook Water District; Willowbrook Water and Sanitation District; Cherry Creek Valley Water and Sanitation District; Cherry Moor Water District; Cherryridge Water and Sanitation District; Devonshire Heights Water and Sanitation District; Lakehurst Water and Sanitation District; City of Littleton; North Pecos Water and Sanitation District; Platte Canyon Water and Sanitation District; and Southwest Metropolitan Water and Sanitation District, Petitioners/Cross–Respondents,

v.

CITY AND COUNTY OF DENVER, a Municipal Corporation, Acting By and Through its BOARD OF WATER COMMISSIONERS, Respondent/Cross–Petitioner.

No. 95SC375.

Supreme Court of Colorado,
En Banc.

Nov. 18, 1996.

Rehearing Denied Jan. 13, 1997.

Grimshaw & Harring, P.C., Richard L. Harring, Denver, for Petitioners/Cross–Respondents Bennett Bear Creek Water and Sanitation District; Meadowbrook Water District; and Willowbrook Water and Sanitation District.

Timothy C. Terrill, Janesville, WI, for Petitioners/Cross–Respondents Cherry Creek Valley Water and Sanitation District; Cherry Moor Water District; Cherryridge Water and Sanitation District; Devonshire Heights Water and Sanitation District; Lakehurst Water and Sanitation District; City of Littleton; North Pecos Water and Sanitation District; Platte Canyon Water and Sanitation District; and Southwest Metropolitan Water and Sanitation District.

Parcel, Mauro, Hultin & Spaanstra, P.C., Peggy E. Montaño, Denver, David E. Bellack, Basalt, Colorado Board of Water Commissioners Legal Department, Patricia L. Wells, Michael L. Walker, Denver, for Respondent/Cross–Petitioner City and County of Denver.

James G. Colvin, II, City Attorney, Gregory L. Johnson, Assistant City Attorney— Utilities Patricia K. Kelly, Senior Litigation Attorney, Colorado Springs, for Amicus Curiae City of Colorado Springs.

Joseph N. de Raismes, III, City Attorney, Boulder, for Amicus Curiae City of Boulder.

Justice HOBBS delivered the Opinion of the Court.

We granted certiorari to review three questions [1] regarding the court of appeals decision in *Bennett Bear Creek Farm Water & Sanitation District v. City & County of Denver,* 907 P.2d 648 (Colo.App.1995). This appeal was brought by municipal and quasi-municipal local governments [2] of the State of Colorado (Districts) which receive a supply of water from the Denver Water Board (Water Board) pursuant to distributor contracts. Through breach of contract, tort, and declaratory judgment claims, the Districts sought review of the Water Board's determination of rates and charges for service outside of the City and County of Denver (extraterritorial service). After a lengthy proceeding which included the entry of detailed findings of fact and conclusions of law, the trial court determined that the Water Board had acted properly in a legislative capacity when setting rates and charges for both in-city and extraterritorial water service and rejected the Districts' breach of contract and common law public utility causes of action. The trial court entered judgment for the Water Board on all claims, dismissed the complaint, and awarded costs of suit in the amount of $192,916.34 against the Districts in favor of the Water Board.

The court of appeals agreed with the trial court's rejection of the Districts' common law

1. We granted certiorari on the following three issues: (1) Whether a municipally-owned public utility not subject to Colorado Public Utilities Commission regulations has a duty not to charge unreasonable or discriminatory rates to users outside the municipality; (2) Whether the trial court erred in awarding costs against the distributors as governmental entities; and (3) Whether the court of appeals erred in determining that the setting of utility rates by a municipally-owned public utility to be charged users outside the municipality is a proprietary rather than a legislative function.

2. Nineteen local governmental entities of the State of Colorado, comprised of water and sanitation districts, water districts, and municipalities, plus Consolidated Mutual Water Company, a private corporation, filed suit in district court. Twelve entities, including eleven quasi-municipal entities and one home rule city, are petitioners/cross-respondents in this appeal: Bennett Bear Creek Farm Water and Sanitation District; Meadowbrook Water District; Willowbrook Water and Sanitation District; Cherry Creek Valley Water and Sanitation District; Cherry Moor Water District; Cherryridge Water and Sanitation District; Devonshire Heights Water and Sanitation District; Lakehurst Water and Sanitation District; City of Littleton; North Pecos Water and Sanitation District; Platte Canyon Water and Sanitation District; and Southwest Metropolitan Water and Sanitation District.

public utility cause of action, but concluded that the Water Board acts in a proprietary capacity when setting rates and charges for extraterritorial water service. Having decided to remand the case on this basis for further proceedings on contractual grounds, the court of appeals did not reach the award of costs issue.

We affirm the court of appeals decision upholding dismissal of the common law public utility cause of action and reverse the court of appeals decision to remand to the trial court for further rate review proceedings. We remand the case for reconsideration of the cost award in light of Chief Justice Directive No. 85–21.

## I.

This appeal continues a long history of cooperation, controversy, and conflict between Denver and certain Denver metropolitan governmental entities which obtain water service from the Water Board.

In Colorado, as demonstrated by the identities of the litigants here, the provision of domestic, municipal, commercial, and industrial water is primarily undertaken by public, not private, entities. Establishment of the citizen-composed Water Board under the Denver city charter was the product of progressive era reform.[3] The Denver Union Water Company, which undertook the Cheesman dam and reservoir project on the South Platte River system[4] was one of several privately-owned utility monopolies, including the gas, electric, and tramway companies, whose influence over the affairs of Denver citizens was pervasive in the late nineteenth and early twentieth centuries.[5] The reform movement led to Denver's purchase of the Denver Union Water company in 1918.[6] *See City of Englewood v. City & County of Denver*, 123 Colo. 290, 294, 229 P.2d 667, 670 (1951), *overruled on other grounds by Board of County Comm'rs v. Denver Bd. of Water Comm'rs*, 718 P.2d 235 (Colo.1986). Thereaf-

ter, the city devoted itself to securing high quality water supplies from the Fraser, Williams Fork, and Blue River systems.[7] *See City & County of Denver v. Sheriff*, 105 Colo. 193, 196–97, 96 P.2d 836, 838 (1939); *City & County of Denver v. Northern Colo. Water Conservancy Dist.*, 130 Colo. 375, 381–83, 276 P.2d 992, 996–97 (1954).

Although each of the Districts is empowered by Colorado law to appropriate water and to develop its own water diversion, storage, carriage, and delivery system, *see* §§ 31–35–402(1), 31–15–708, 12B C.R.S. (1986), each has chosen to rely, in whole or in part, on Water Board supplies. *See City & County of Denver v. Colorado River Water Conservation Dist.*, 696 P.2d 730, 741–42 (Colo.1985). In 1939 we recognized Denver's authority to lease water not needed for its immediate use and to receive a financial return therefrom. *Sheriff*, 105 Colo. at 208, 96 P.2d at 843. Despite recurring attempts to limit Denver water service to the city itself by Denver citizens, *Colorado Open Space v. City & County of Denver*, 190 Colo. 122, 123, 543 P.2d 1258, 1259 (1975), and the Colorado River Water Conservation District, *Colorado River Water Conservation Dist.*, 696 P.2d at 743, the Water Board has been successful in establishing that its powers include supplying water extraterritorially to the Districts.

■ Contracts with the Water Board for extraterritorial service are highly prized because of the priority of Denver's water rights, the extent of its waterworks system, and the high quality of its water sources. But the Water Board's power to set rates and curtail deliveries when needed for in-city demands has generated conflict between the Districts and the Water Board despite their commonality of interest in the viability of the city's water supply and waterworks. At the time of trial in 1993 approximately forty percent of Denver's water service was extraterritorial. Colorado recognizes the validity of

---

3. *See generally* Carl Abbott et al., *Colorado, A History of the Centennial State* 248–49 (rev. ed.1982).

4. *Id.* at 241; Bill Barker and Jackie Lewin, *Denver!* 91 (1972).

5. Abbott, *supra*, at 246.

6. *See generally* Lyle W. Dorsett, *The Queen City* 159 (1977).

7. *See generally Id.* at 206–07, 251.

perpetual term water contracts. *See Cherokee Water Dist. v. City of Colorado Springs,* 184 Colo. 161, 164, 519 P.2d 339, 340–41 (1974). The Districts' contracts are perpetual.

The steps normally involved in rate determination are establishment of the revenue requirement, a cost-of-service study, the allocation of costs to specific customer groups, and the design of a rate schedule.[8] Overall, rates and charges must raise the revenue required to construct, operate, repair and replace the water works, meet bonded indebtedness requirements, pay the overhead and other costs of providing service, and recover an acceptable rate of return on investment. *See generally* Phillips, *supra,* note 8 at 301–03. Here, the underlying lawsuit arose from changes that the Water Board made in its utility rate determination methodologies. From the 1960s to the 1980s, in calculating rate base, the Water Board used the "current use" method of allocating water facility plant value by which capital costs were assigned based on water consumption. In 1980, the Water Board changed to the "historic investment" method under which capital costs were allocated on an incremental growth basis. In 1990, the Water Board adopted a version of the historical investment method termed the "split allocation" method, with capital costs being allocated on an incremental growth basis and operation, repair, and replacement costs being allocated on a current use basis. In 1992, the Water Board refined the split allocation methodology, by which capital investment in water facilities is added together and proportionately split between in-city and extraterri-

torial service based upon 35 years of historical growth and 35 years of prospective growth.

The Districts challenge the Water Board's departure from the current use method in effect prior to 1980. Essentially, the Water Board's revised rates now in effect are intended to reflect the increasing growth in the percentage of water service provided by the Water Board for extraterritorial service as compared to in-city service and to provide Denver with a rate of return on its plant investment for extraterritorial service pursuant to the Water Board's authority and mandate under the city charter. In making its decision following an extensive rate investigation,[9] the Water Board concluded that the city charter and the contracts with the Districts allowed and required the Water Board to adjust rates and charges to account for the increasing differential in growth within the Districts as compared to Denver.

Contracts between the Water Board and the Districts incorporate the Denver city charter. Pertinent provisions of the charter include sections C4.14 and C4.18, which empower the Water Board to exercise all authority the city has over the provision of water and the construction, operation, repair and replacement of water works. *Colorado River Water Conservation Dist.,* 696 P.2d at 741. Section C4.26 of the charter requires curtailment of water deliveries to the Districts when the water is needed to serve in-city needs and provides that charges for such leased water shall secure full reimbursement to the people of Denver, together with an additional amount to be determined by the Water Board.[10] Section C4.22 prescribes

---

8. Charles F. Phillips, Jr., *The Regulation of Public Utilities* 766 (2d ed.1988). Expert witness Robert F. Banker testified at trial here that relative growth among customer groups and cumulative net plant capacity devoted to extraterritorial service are generally accepted utility factors to be employed in rate-base determinations.

9. Water Board president Hubert A. Farbes testified that the rate study commenced because of assertions by Denver residents of alleged overcharges to in-city customers under the then-existing rate structure. In examining what structure would provide for rate making on a standardized basis in the future, the Board created an advisory study group which included representatives of suburban interests.

10. Section C4.26 of the Denver city charter states as follows:

> The Board shall have power to lease water and water rights for use outside the territorial limits of the City and County of Denver, *but such leases shall provide for limitations of delivery of water to whatever extent may be necessary to enable the Board to provide an adequate supply of water to the people of Denver* and provided, further, that every such lease shall contain terms to secure the payment into the Water Works Fund of sufficient money to *fully reimburse the people of Denver for the cost of furnishing the water or water right which is the subject of such lease together with an additional amount to be determined by the Board.* Sales at

that rates for use of water within the city must be "as low as good service will permit." *Cottrell v. City & County of Denver*, 636 P.2d 703, 710 (Colo.1981).

The Districts concede that the Water Board may require higher rates and charges for extraterritorial service as compared to in-city service. But they contend, nevertheless, that Denver is bound by common law public utility duties in providing service outside its boundaries and, further, under a "proprietary" versus "governmental" view of rate setting, that the Water Board is constrained by at least two provisions in District contracts which are alleged to cap the allowable proportion of rate spread between in-city and extraterritorial service.

Previously, we have determined that extraterritorial water service by the Water Board could be regulated as a public utility by the Public Utilities Commission (PUC), if the General Assembly so chose. To the contrary, however, under section 31–35–402(1)(f), 12B C.R.S. (1986), the legislature has acted to prohibit the PUC or "any other board, agency, bureau, commission, or official" from regulating governmental water service. *Board of County Comm'rs v. Denver Bd. of Water Comm'rs*, 718 P.2d 235, 246 (Colo.1986) (*Tri–Counties*); *see also City of Thornton v. Public Utils. Comm'n*, 157 Colo. 188, 194–95, 402 P.2d 194, 197 (1965). In sum, we have held that municipalities are not regulated public utilities when providing extraterritorial water service. *Tri–Counties*, 718 P.2d at 246. We did not determine in *Tri–Counties* whether courts of this state may employ common law public utility standards in the course of reviewing rates, fees, tolls, and other charges set by municipal or quasi-municipal entities for extraterritorial water service they provide.

■ Here, both the trial court and the court of appeals, relying on *Southgate Water District v. City & County of Denver*, 862 P.2d 949 (Colo.App.1992), rejected the Districts' common law public utility claims. We agree. However, the court of appeals additionally concluded that Denver acts in a proprietary capacity when setting rates and charges for extraterritorial service and should be governed "largely by the same rules that apply to private corporations." By this, we understand the court of appeals to have meant that the Water Board's rate setting for extraterritorial service is not legislative in nature. We disagree.

The trial court ruled that the Water Board acts in a legislative capacity when setting rates and charges applicable to both in-city and extraterritorial service. It reasoned that rates and charges for extraterritorial service can be fixed under the city charter and the existing contracts with the Districts only in relation to in-city service, and that the Districts had accepted Denver's rate-setting role through the contracts and by operation of applicable Colorado law. The trial court concluded that the judicial review standard to be applied is the one applicable to review of legislative or quasi-legislative action: whether the alleged discriminatory rate is rationally related to a legitimate utility purpose. The trial court phrased the test as follows: "whether the rate set is rationally related to the governmental purpose of reimbursing the Defendant [Denver] for the cost of furnishing the water service plus additional amounts rationally related to other legitimate, utility-related purposes." We agree with the trial court.

The trial court awarded $192,916.34 in costs against the Districts in favor of Denver. Under C.R.C.P. 54(d) and Chief Justice Directive No. 85–21 which implements that rule, the award of costs against a political subdivision of the state is greatly restricted. Accordingly, we remand for reconsideration of the cost award in accordance with that directive.

## II.

### Summary of Decision

■ We agree with the trial court's entry of judgment against the Districts because

---

amounts less than the above minimum may be made if warranted by economic conditions, but a contract providing for such lesser charge shall not extend for more than one year.

(Emphasis added.)

the General Assembly, under section 31–35–402(1)(f), has conferred legislative rate-making authority for both in-boundary and extra-territorial water service on the municipal or quasi-municipal entity which supplies that service. The legislature chose not to confer extraterritorial water service rate-setting authority on the PUC. Section 31–35–402(1)(f) has displaced the common law and the PUC in regard to rate making for extraterritorial water service.[11] Rate setting under section 31–35–402(1)(f) is legislative in nature. In the absence of a statutory judicial review mechanism and standard applicable to such municipal and quasi-municipal rate-setting action, judicial review occurs by way of declaratory judgment, employing the rational basis test pertaining to governmental legislative or quasi-legislative action. Rate classifications which are rationally related to a legitimate governmental utility purpose will be upheld. The burden of demonstrating lack of such a rational relationship for the rate is upon those challenging the legislative action of the rate maker. Contracts containing terms regarding rates and charges must be construed and given effect in light of the legislative authority of the governmental entity which supplies the water service. Applying this body of law, the trial court was correct in entering judgment against the Districts.

## A.

### Common Law Public Utility Claims

The Districts here press a theory of common law public utilities regulation which we conclude would substitute the courts for the PUC, a choice which the General Assembly has precluded. Our decision in *Tri–Counties* interpreting section 31–35–402(1) forecloses such a role for the judiciary and controls the outcome of this case.

We must give effect to the meaning, as well as every word of a statute if possible. *See Colorado Ground Water Comm'n v. Eagle Peak Farms*, 919 P.2d 212, 218 (Colo. 1996). Section 31–35–402(1)(b) vests each municipality and quasi-municipal entity of the State of Colorado, including the Districts and Denver, *see* § 31–35–401(4), 12B C.R.S. (1986), with the power to operate and maintain water and/or sewerage facilities [12] "for its own use and for the use of public and

11. The rate-making authority of the PUC is set forth by statute, as follows:

> The power and authority is hereby vested in the public utilities commission of the state of Colorado and it is hereby made its duty to adopt all necessary rates, charges, and regulations to govern and regulate all rates, charges, and tariffs of every public utility of this state to correct abuses; to prevent unjust discriminations and extortions in the rates, charges, and tariffs of such public utilities of this state; to generally supervise and regulate every public utility in this state; and to do all things, whether specifically designated in articles 1 to 7 of this title or in addition thereto, which are necessary or convenient in the exercise of such power, and to enforce the same by the penalties provided in said articles through proper courts having jurisdiction; except that nothing in this article shall apply to municipal natural gas or electric utilities for which an exemption is provided in the constitution of the state of Colorado, within the authorized service area of each such municipal utility except as specifically provided in section 40–3.5–102.

§ 40–3–102, 17 C.R.S. (1993).

12. The definition of water facilities for all purposes of these powers is comprehensive under § 31–35–401(7), 12B C.R.S. (1986):

> "Water facilities" means any one or more works and improvements used in and as a part of the collection, treatment, or distribution of water for the beneficial uses and purposes for which the water has been or may be appropriated, including, but not limited to, uses for domestic, municipal, irrigation, power, and industrial purposes and including construction, operation, and maintenance of a system of raw and clear water and distribution storage reservoirs, deep and shallow wells, pumping, ventilating, and gauging stations, inlets, tunnels, flumes, conduits, canals, collection, transmission, and distribution lines, infiltration galleries, hydrants, meters, filtration and treatment plants and works, power plants, all pumping, power, and other equipment and appurtenances, all extensions, improvements, remodeling, additions, and alterations thereof, and any and all rights or interests in such works and improvements; but, no municipality shall construct or acquire facilities for the sale of electric energy or power, except hydroelectric energy or power for sale at wholesale only, without complying with the provisions of section 31–15–707.

private consumers and users *within and without the territorial boundaries of the municipality*," provided that "no water service or sewerage service or combination of them shall be furnished in any other municipality unless the approval of such other municipality is obtained as to the territory in which the service is to be rendered." *Id.* (emphasis added); *See also* § 31–15–708(1)(d).

The power of municipal and quasi-municipal entities to contract in connection with water service is set forth in paragraphs (1)(e), (h) and (i) of section 31–35–402. In pertinent part, the provisions of paragraph (h) allow the municipality providing the service and the municipality receiving the service to contract with one another for payment of amounts involved in all facets of constructing, operating, maintaining, and replacing water facilities, servicing bonds, and providing water service:

> Pursuant to any such contracts or agreements, such municipalities may obligate themselves to make payments in amounts which shall be sufficient to enable any municipality which finances such water facilities or sewerage facilities or both to meet its expenses, the interest and principal payments for its bonds, its reasonable reserves for debt service, operation and maintenance, and renewals and replacements, and the requirements of any rate

covenant with respect to debt service coverage contained in any resolution, ordinance, or other security instrument.

§ 31–35–402(1)(h).

Although the General Assembly has empowered municipal and quasi-municipal entities to provide water service outside of their boundaries, *Colorado Open Space v. City & County of Denver*, 190 Colo. at 124, 543 P.2d at 1259–60, such entities are not obligated to do so, *Brownbriar Enters. v. City & County of Denver*, 177 Colo. 198, 203, 493 P.2d 352, 354 (1972); *Schlarb v. North Suburban Sanitation Dist.*, 144 Colo. 590, 592, 357 P.2d 647, 648 (1960). When extraterritorial service is provided, those receiving the service become subject to the rate-setting authority of the governmental supplier under section 31–35–402(1)(f). By enacting this section, the General Assembly has vested the power to prescribe, revise, and collect rates, fees, tolls, and other charges, for both internal and external water service, exclusively in the governing body of the municipality or quasi-municipal entity which provides the service. Supervision, modification, or regulation by *any* other entity or official is precluded.[13] This rate-making authority conferred on the local governmental water supplier thus supplants the rate-making authority of the PUC under section 40–3–102.[14]

**13.** Subsection (1), paragraph (f), of section 31–35–402 states as follows:

**Powers.** (1) *In addition to the powers which it may now have,* any municipality, without any election of the qualified electors thereof, has power under this part 4:

(f) *To prescribe, revise, and collect* in advance or otherwise, from any consumer or any owner or occupant of any real property connected therewith or receiving service therefrom, *rates, fees, tolls, and charges or any combination thereof for the services furnished by, or the direct or indirect connection with, or the use of, or any commodity from such water facilities* or sewerage facilities or both, including, without limiting the generality of the foregoing, minimum charges, charges for the availability of service, tap fees, disconnection fees, reconnection fees, and reasonable penalties for any delinquencies, including but not necessarily limited to interest on delinquencies from any date due at a rate of not exceeding one percent per month or fraction thereof, reasonable attorneys' fees, and other costs of collection *without*

*any modification, supervision, or regulation of any such rates, fees, tolls, or charges by any board, agency, bureau, commission, or official other than the governing body collecting them;* and in anticipation of the collection of the revenues of such water facilities or sewerage facilities, or joint system, to issue revenue bonds to finance in whole or in part the cost of acquisition, construction, reconstruction, improvement, betterment, or extension of the water facilities or sewerage facilities, or both; and to issue temporary bonds until permanent bonds and any coupons appertaining thereto have been printed and exchanged for the temporary bonds.

(Emphasis added.)

**14.** *See* note 11, *supra*. The list of enumerated charges set forth in § 31–35–402(1)(f) is illustrative, not restrictive. *City of Arvada v. City & County of Denver*, 663 P.2d 611, 614–15 (Colo. 1983). Because § 31–35–402(1)(f) controls, we reject the Districts' argument that the Uniform Commercial Code governs water delivery rates and charges.

The authority of the Districts to enter into contracts by which they incur the obligation to pay amounts due to the Water Board, as supplier of water to them, is enabled and further supplemented by the provisions of section 31–35–402(1). This authority augments the power of water districts and water and sanitation districts, such as the Districts here, to increase or decrease minimum charges and set reasonable rates, tolls, or charges for making water service available. *See* §§ 32–1–1001(k), 32–1–1006(1)(g), (h), 13 C.R.S. (1996 Supp.). *Cf. Brownbriar Enters. v. City & County of Denver,* 177 Colo. at 203, 493 P.2d at 354 (citing to 1963 Colorado statutes).

In *Cherokee Water District v. City of Colorado Springs,* 184 Colo. 161, 163–64, 519 P.2d 339, 340 (1974), we interpreted the rate-making powers of the then-existing water and sanitation district statute as not applying to extraterritorial service provided by contract. But the following year the General Assembly adopted House Bill 1089, which reenacted the provisions of paragraphs (1)(b), (f) and (h) of section 31–35–402 as an additional grant of authority to local government water suppliers, including water districts and water and sanitation districts. Ch. 275, sec. 1, § 31–35–402(1)(b), (f) and (h), 1975 Colo. Sess. Laws 1004, 1251–53. Through these provisions which, as to water service, were originally enacted in House Bill 72, ch. 89, secs. 1, 2, §§ 139–52–1, –2, 1962 Colo. Sess. Laws 280, 280–84, *see City of Thornton,* 157 Colo. at 195–96, 402 P.2d at 197–98, the General Assembly replaced PUC rate making with local governmental rate making in the arena of both in-boundary and extraterritorial service.

The rate-setting power vested by section 31–35–402(1)(f) in local governmental water suppliers exists in sharp contrast to the status of non-governmental public utilities in Colorado. At the time of statehood, the framers of our state constitution were concerned about the possibility of exorbitant prices being charged by private individuals or corporations utilizing their waterworks, for hire, to deliver irrigation water to farmers who could not afford to construct and operate their own water facilities. Accordingly, article XVI, section 8, of the Colorado Constitution provides that county commissions have authority to set reasonable maximum rates for water service by private carriers.[15]

In *Wheeler v. Northern Colorado Irrigation Co.,* 10 Colo. 582, 589, 17 P. 487, 490 (1887), we determined that such private carriers are "engaged in the business of transporting, for hire, water owned by the public, to the people owning the right to its use." We have distinguished such carriers from mutual water companies which are organized for the express purpose of providing water to their shareholders. *Farmers Water Dev. Co. v. Barrett,* 151 Colo. 140, 148, 376 P.2d 693, 697–98 (1962).

Initially, municipalities in this state were held to be subject to PUC jurisdiction in regard to extraterritorial service. In *City of Lamar v. Town of Wiley,* 80 Colo. 18, 23, 248 P. 1009, 1010 (1926), we held that such service can be regulated by the PUC in the same manner as a non-governmental public utility which furnishes like service. We concluded that a city lacked authority to set rates for extraterritorial service and that the authority of the PUC over such rates must be read into every contract between a municipal supplier and its external customers. 80 Colo. at 23–24, 248 P. at 1010–11. *See also City of Loveland v. Public Utils. Comm'n,* 195 Colo. 298, 303, 580 P.2d 381, 385 (1978) (holding that municipalities providing extraterritorial public utility service are presumed

15. Section 8 of article XVI of the Colorado Constitution, as finally adopted by the constitutional convention, reads as follows: "Section 8. The General Assembly shall provide by law that the board of county commissioners in their respective counties, shall have power, when application is made to them by either party interested, to establish reasonable maximum rates to be charged for the use of water, whether furnished by individuals or corporations." *See Proceedings of the Constitutional Convention, Colorado, 1875–* *1876,* 700–01 (The Smith–Brooks Press, State Printers ed., 1907). This grant of power replaced an earlier proposed provision which read as follows: "Sec. 5 'The inherent power to prescribe the rates to be charged for water for irrigation and mining purposes is inalienably in the State, and the General Assembly shall never directly or indirectly transfer such power to any private corporation, company or person.'" *Id.* at 393.

to be subject to PUC regulation). In *Seaton Mountain Electric v. Idaho Springs Investment Co.*, 49 Colo. 122, 126–27, 111 P. 834, 835 (1910), we articulated a common law rule of public utility regulation that rates must be reasonable, just, and lawful, not capricious, arbitrary, oppressive, unreasonable, or discriminatory.

Despite the fact that the General Assembly has authority to provide for PUC regulation of extraterritorial governmental water service, we also early recognized the power of the General Assembly to grant municipalities the authority to set rates. *City of Fort Collins v. Public Utils. Comm'n*, 69 Colo. 554, 556, 195 P. 1099, 1099 (1921). The General Assembly exercised such authority when it adopted section 31–35–402(1)(f).

■ As we held in *Tri–Counties*, Colorado has adopted a comprehensive system of public utilities regulation that supersedes the common law. 718 P.2d at 243. Preemption of the common law includes the rate-setting authority granted by the General Assembly to local governmental entities. In *Matthews v. Tri–County Water Conservancy District*, 200 Colo. 202, 206–07, 613 P.2d 889, 892–93 (1980), we delineated the defining characteristic of PUC regulated status in this state as the extent to which a business impressed with the public interest holds itself out as serving, or ready to serve, indiscriminately, all of the public in a service area.[16] We there held that a water conservancy district operating under its authority as a political subdivision and body corporate with all the powers of a public or municipal corporation is not subject to regulation by the PUC, because the rate-setting powers of conservancy districts under section 37–45–118(1)(g), 15 C.R.S. (1973) replaced PUC rate-setting jurisdiction. *Matthews*, 200 Colo. at 207, 613 P.2d at 893.

The following year, in *Cottrell v. City & County of Denver*, 636 P.2d 703, 710 (Colo. 1981), we had occasion to identify rate making as governmental in nature and "essentially a legislative function," not quasi-judicial. We there refused, on standing grounds, to address the claims of Denver citizens who

sought to invoke PUC jurisdiction over extraterritorial water service. *Id.* at 711–12. Five years later, in *Tri–Counties* we ruled that PUC rate making does not apply to extraterritorial water service by a municipal or quasi-municipal entity, in light of the express choice of the General Assembly to vest the rate-making authority in the local governmental water supplier. *See Tri–Counties*, 718 P.2d at 245 ("[T]he Board argues that it is the public policy of this state that municipal utilities have total authority over the provision of water service to users inside and outside municipal boundaries. We agree.").

■ In *Tri–Counties* we did not address the nature and scope of local government rate-setting powers under section 31–35–402(1)(f). The teaching of *Cottrell*, a case involving the Water Board and its city charter, is that rate making is a governmental legislative power. 636 P.2d at 708–10. That teaching is both undisturbed and applicable to the present case. The district court and the court of appeals were correct in determining that, whatever PUC or common law public utility regulatory or judicial review standards might otherwise apply, the General Assembly has specifically chosen to vest the rate-making authority in the local governmental water supplier.

The Districts seek what they describe as "a court supervised regulatory remedy," by which the judiciary, in substitution for the PUC, would require modification of rates to make them "fair" and "reasonable" when appropriate. However, accepting such a role would substitute the judiciary for the lawfully empowered body, here the Water Board. We have previously said that "the judiciary must refrain from any semblance of rate making." *Public Utils. Comm'n v. District Court*, 186 Colo. 278, 282, 527 P.2d 233, 234 (1974). Avoiding such a role stems from our obligation to respect separation of powers in the arena of legislative authority delegated to a governmental body pursuant to the constitution or statutes. *See Adams County*

---

16. The Water Board has not held itself out as serving, or ready to serve, exclusively, all of the

public. *See Tri–Counties*, 718 P.2d at 239.

*School Dist. v. Heimer*, 919 P.2d 786, 799 (1996).

### B.

### Standard for Judicial Review of Local Governmental Rate–Making Decisions

In the past we have utilized the term "proprietary" to describe Denver's water service to the Districts, *e.g.*, *Colorado Open Space v. City & County of Denver*, 190 Colo. 122, 125, 543 P.2d 1258, 1260 (1975); *City & County of Denver v. Colorado River Water Conservation Dist.*, 696 P.2d 730, 742 (Colo. 1985). The Districts rely upon such categorization to argue that governmental entities operating outside of their boundaries are the equivalent of non-governmental utilities and that contract law exclusively governs the extraterritorial service rate-setting function. The court of appeals agreed with this rationale and remanded the case to the district court for additional rate review under a proprietary versus governmental distinction. In this the court erred.

Our previous use of the term "proprietary" in case decisions is not controlling with regard to the nature and scope of rate making under section 31–35–402(1)(f). In *Colorado Open Space*, 190 Colo. at 123–25, 543 P.2d at 1259–60, we used the "proprietary" description to distinguish a contractual service, in circumstances where a city is under no duty to serve yet decides to do so, from in-city service which is owed to consumers because of their resident status. *See also City of Englewood v. City & County of Denver*, 123 Colo. 290, 299, 229 P.2d 667, 672 (1951), *overruled on other grounds by Tri–Counties*, 718 P.2d 235 (Colo.1986) ("Even if the pertinent constitutional provision and statute ... were not controlling, this proprietary function would not bring it within the public utility statute.").

Secondly, we have invoked the proprietary distinction to emphasize the role the General Assembly plays in determining what regulatory framework, if any, is applicable to extraterritorial water service. *See City & County of Denver v. Colorado River Water Conservation Dist.*, 696 P.2d 730, 742 (Colo.1985) ("We have observed that when a city undertakes to supply water outside its boundaries, it is acting in a proprietary capacity. In this capacity, the municipality is subject to the authority of the General Assembly.") (citations omitted). While the term "proprietary" describes a type of service, *i.e.*, discretionary service by contract out of the boundaries of the governmental supplier, it does not define the nature and extent of the grant of rate-making authority conferred by section 31–35–402(1)(f), nor the judicial standard to be applied when reviewing local government rate-making actions.[17]

Despite the Water Board's urging in this case, we find no occasion here to extinguish all reference to a governmental versus proprietary distinction. When operating a utility a governmental entity may engage in contracting functions which we have described as being proprietary. Contracts cannot simply be abrogated, or ignored, and must be given effect in light of their essential purpose and effect. In *Colowyo Coal Co. v. City of Colorado Springs*, 879 P.2d 438, 448 (Colo.App.1994), *cert. denied*, No. 94SC262 (Colo. Sept. 12, 1994), for example, the court of appeals utilized a proprietary analysis to uphold enforcement of a City of Colorado Springs contract with a private company for a coal supply. The court was careful, however, to distinguish acts that were proprietary in the operation of the utility as opposed to the setting of rates. *Id.* at 444. ("Here, the parties were engaged in contracting for a

---

17. Viewing contractually-provided service as proprietary did not prevent us from concluding in *Tri–Counties* that the rate-setting authority placed in municipal and quasi-municipal entities, § 31–35–402(1)(f), precluded PUC regulation of extraterritorial service. *Tri–Counties*, 718 P.2d at 246. We there noted that 40% of the water then distributed by the Water Board was being delivered outside the boundaries of Denver and that staff estimates were that this percentage would grow to 80% by the year 2014. *Id.* at 239. Nevertheless, we rejected the "effective monopoly" argument, *id.* at 240, and concluded that the Water Board, a governmental entity acting pursuant to a legislative grant of authority, was exempt from regulation applicable to other public utilities because "municipal utilities have total authority over the provision of water service to users inside and outside municipal boundaries." *Id.* at 245.

long term supply of coal. This act was proprietary because it dealt with the operation of the utility and not with the setting of rates.").

 Nevertheless, we have previously questioned the continuing viability of the governmental/proprietary demarcation. *See City & County of Denver v. Mountain States Tel.,* 754 P.2d 1172, 1175 (Colo.1988). To the extent that prior cases may have intimated that rate setting can be partitioned between a legislative function and a contractual function based on a distinction between in-boundary and extraterritorial service, we hold that the legislature has determined otherwise through section 31–35–402(1)(f). Our discussion in *Cottrell* regarding the legislative nature of Water Board rate setting specifically referred to both in-city and extraterritorial service. 636 P.2d at 709–10.

 The *Cottrell* case was not the first to describe rate making as a legislative function. We have long held that PUC rate making is legislative in nature. *Public Utils. Comm'n v. District Court,* 186 Colo. 278, 282, 527 P.2d 233, 234 (1974) ("In public utilities law, it is a basic concept that rate making is a legislative function and that in Colorado that function has been delegated to the PUC."); *Fort Collins Motor Homes v. City of Fort Collins,* 30 Colo.App. 445, 449, 496 P.2d 1074, 1077 (1972) (the "fixing of rates by

a municipality is a legislative act"). Legislative rate-setting authority conferred by the legislature cannot be alienated or delegated to another by governmental entities which have been granted that authority. *Baca Grande Corp. v. Public Utils. Comm'n,* 190 Colo. 201, 203, 544 P.2d 977, 978 (1976).

 When the General Assembly confers rate-making authority on local government in lieu of the PUC, an equivalent level of deference to the local governments as to the PUC is due.[18] The underlying basis for the legislative grant of water service rate-making authority to local governments is that they are constrained against seeking monopoly profits by their governmental powers and duties, with recourse available by way of a declaratory judgment action to the courts, or to the General Assembly by those who believe that extraterritorial water service should be attended by PUC or some other form of regulatory standard setting. Although we have sometimes utilized the term "proprietary capacity" in describing water service provided by a governmental entity through contractual agreement, this categorization is not authoritative in the absence of a statutorily prescribed review standard applicable to local government rate setting. While the standard for judicial review of PUC rate making is set forth by statute, § 40–3–111(1), 17 C.R.S. (1996 Supp.), and § 40–6–115(3), 17 C.R.S. (1993),[19] no such statutory delineation

---

18. The Water Conservancy Act, for example, plainly demonstrates that rate making is legislative in nature; the conservancy district board has the power and a duty to examine and adjust rates by rule and regulation, a quasi-legislative function, so that rates are equitable as between users in the same class of service. *See* §§ 37–45–123(1)(b), –124(1)(b), –125(3)(b), 15 C.R.S. (1996 Supp.). Local governments are also empowered to establish water activity enterprises under control of the governing body of such "districts," *see* § 37–45.1–102(1), 15 C.R.S. (1996 Supp.), or such governing body as may be designated, including by city charter. *See* § 37–45.1–103(1),(3), 15 C.R.S. (1996 Supp.). Such enterprises must receive less than ten percent of their revenue from "grants" and the enterprise cannot levy a tax. *See* Colo. Const. art. X, § 20(2)(d); §§ 37–45.1–102(2), –103(4), 15 C.R.S. (1996 Supp.). Rates charged and revenues collected by the governing body in connection with the water activity enterprise are not subject to the revenue and spending limitations of article X, section 20(4) or (7) of the Colorado Constitution (Amend-

ment 1), nor are they deemed to be a tax subject to the limitations of those sections. § 37–45.1–106(2),(3), 15 C.R.S. (1996 Supp.).

19. Section 40–3–111(1) provides:

**40–3–111. Rates determined after hearing.** (1) Whenever the commission, after a hearing upon its own motion or upon complaint, finds that the rates, tolls, fares, rentals, charges, or classifications demanded, observed, charged, or collected by any public utility for any service, product, or commodity, or in connection therewith, including the rates or fares for excursion or commutation tickets, or that the rules, regulations, practices, or contracts affecting such rates, fares, tolls, rentals, charges, or classifications are unjust, unreasonable, discriminatory, or preferential, or in any way violate any provision of law, or that such rates, fares, tolls, rentals, charges, or classifications are insufficient, the commission shall determine the just, reasonable, or sufficient rates, fares, tolls, rentals, charges, rules, regulations,

has been made in connection with the authority conferred under section 31–35–402(1)(f).

Therefore, our inquiry regarding the applicable standard must be informed by rules, statutes, and case law pertinent to judicial review of local governmental legislative action. Such review occurs by means of declaratory judgment under C.R.C.P. 57 and sections 13–51–101 to –115, 6A C.R.S. (1987), not by way of on-the-record review under the state Administrative Procedure Act, § 24–4–106, 10A C.R.S. (1988), or C.R.C.P. 106(a)(4). *See Liquor & Beer Licensing Advisory Bd. v. Cinco, Inc.,* 771 P.2d 482, 485 (Colo.1989).

The General Assembly has plenary power to establish legislative authority in municipal and quasi-municipal entities over matters of public policy, and narrow judicial review thereof under a declaratory judgment action is available. *See State Farm Mut. Auto. Ins. Co. v. City of Lakewood,* 788 P.2d 808, 816 (Colo.1990). Such review must respect the separation of powers and avoid intruding on the policy-making function of the legislative body. *Colorado Ground Water Comm'n v. Eagle Peak Farms,* 919 P.2d 212, 221 (Colo.1996). Since rate making is a legislative function which involves many questions of judgment and discretion, the utility methodology chosen by an entity empowered with rate-making authority will not be set aside unless inherently unsound. *City*

*of Montrose v. Public Utils. Comm'n,* 629 P.2d 619, 623–24 (Colo.1981); *Colorado Ute Elec. Ass'n v. Public Utils. Comm'n,* 198 Colo. 534, 539–40, 602 P.2d 861, 864 (1979). The rate-making entity is not bound by prior utilized utility methodologies when it has a reasonable basis, in the exercise of its policy function, to adopt a different methodology. *See Colorado Ute,* 198 Colo. at 540–41, 602 P.2d at 865. Rates and charges rationally related to the governmental utility purpose, including having additional development pay its own way, are within the authority of section 31–35–402(1)(f). *City of Arvada v. City & County of Denver,* 663 P.2d 611, 614–15 (Colo.1983).

Although consumers in the same class of service should be subject to substantially similar rates, a municipality or quasi-municipal entity may establish different classifications of service, and different rates between classifications, based on factors that establish a rational basis for the distinctions. 12 Eugene McQuillin, *The Law of Municipal Corporations* § 35.37.10 (3d ed. rev.vol.1995). Classifications that neither impinge on fundamental rights, nor affect suspect classes, will be upheld as not unlawfully discriminatory unless they do not have a rational relationship to a legitimate governmental purpose.[20] *Collopy v. Wildlife Comm'n,* 625 P.2d 994, 1002 (Colo.1981). Rates and charges may be adjusted in the exercise of legislative rate-

---

practices, or contracts to be thereafter observed and in force and shall fix the same by order. In making such determination, the commission may consider current, future, or past test periods or any reasonable combination thereof and any other factors which may affect the sufficiency or insufficiency of such rates, fares, tolls, rentals, charges, or classifications during the period the same may be in effect, and may consider any factors which influence an adequate supply of energy, encourage energy conservation, or encourage renewable energy development.

Section 40–6–115(3) provides as follows:

Upon review, the district court shall enter judgment either affirming, setting aside, or modifying the decision of the commission. So far as necessary to the decision and where presented, the district court shall decide all relevant questions of law and interpret all relevant constitutional and statutory provisions. The review shall not extend further than to determine whether the commission has regularly pursued its authority, including a deter-

mination of whether the decision under review violates any right of the petitioner under the constitution of the United States or of the state of Colorado, and whether the decision of the commission is just and reasonable and whether its conclusions are in accordance with the evidence.

**20.** In *Western Heights Land Corp. v. City of Fort Collins,* 146 Colo. 464, 468, 362 P.2d 155, 158 (1961), we said that a city operating a water system "may establish rates or charges not *per se* excessive or unreasonable ... which in the judgment of its governing board will pay the cost of extending its service and yield a fair return...." We described water service rate setting as "within the legislative authority of the municipality." *Id.* at 466, 362 P.2d at 157. Significantly, in *Western Heights,* we discussed the reasonable expectation that rates will fluctuate with changing conditions and can differ between types of service; "it is not required by law that they shall remain stationary." *Id.* at 467, 362 P.2d at 157.

making power as an explicit or necessarily implied contract provision. *See City of Lamar v. Town of Wiley*, 80 Colo. 18, 24, 248 P. 1009, 1011 (1926). It is expected that a municipally-owned utility will have a reasonable return on investment based on plant value. 12 McQuillin, *supra*, § 35.37.25.

Those challenging legislative action have a heavy burden to sustain. *See Board of County Comm'rs v. Simmons*, 177 Colo. 347, 351, 494 P.2d 85, 87 (1972); *Colorado Ground Water Comm'n v. Eagle Peak Farms*, 919 P.2d 212, 217 (Colo.1996). Rates that are not rationally related to a local government utility purpose are subject to being set aside if those challenging the rate carry their burden of proving lack of such a relationship. The court cannot substitute its judgment for that of the rate-making authority or choose between appropriate alternatives. *City of Montrose v. Public Utils. Comm'n*, 629 P.2d 619, 623 (Colo.1981); *see Peoples Natural Gas Div. v. Public Utils. Comm'n*, 193 Colo. 421, 427, 567 P.2d 377, 381 (1977). Evidence must be viewed in the light most favorable to that authority's decision. *See Morey v. Public Utils. Comm'n*, 629 P.2d 1061, 1068 (Colo.1981). Whether the rate-setting authority has properly pursued its legal powers is a matter for the court to determine, *see Mountain States Tel. v. Public Utils. Comm'n*, 182 Colo. 269, 279, 513 P.2d 721, 726 (1973).

## C.

### Applying These Standards to Denver Rate Making

In *Cottrell v. City & County of Denver*, 636 P.2d 703, 709, (Colo.1981), we emphasized the importance of sufficient statutory and administrative standards and safeguards to protect against unnecessary and uncontrolled exercise of legislative power by a governmental body such as the Water Board. But we also determined in *Cottrell* that the Denver city charter contained sufficient guidance for the rate-setting process and that requisite procedural safeguards had been provided through the requirement that Water Board meetings be open to the public and the schedule of rates adopted at those meetings be made available for subsequent public inspection. *Id.* at 710. These safeguards are not unique to Denver residents and were afforded to the Districts in the Water Board's rate-setting proceedings which preceded this appeal.

The trial court found that the rate-setting procedure which Denver undertook in this case involved extensive consideration of expert opinions bearing on utility rate making and included opportunity for public comment; further, that the Water Board's inquiry focused properly on the appropriate allocation of costs and return in connection with service both inside or outside of the city. Indeed, the record contains expert reports and testimony on various methodologies which document the breadth of the Water Board's inquiry and consideration. The trial court conducted a thorough examination of the Districts' contentions. Due process requirements related to legislative action impacting the Districts, and judicial review thereof, were met in this case.

By its findings of fact and conclusions of law, the trial court demonstrated proper attention to the judicial standard to be invoked in reviewing local governmental rate-setting determinations. The applicable test for reviewing legislative or quasi-legislative action involves ascertaining the reasonable relationship between the determination made and the legitimate governmental purpose forwarded. The Districts have authority to construct, operate, and maintain their own water systems and purchase or appropriate their own water rights, yet they have subscribed to Denver water service and accepted, through incorporation of Denver's city charter and by reason of section 31–35–402(1)(f), the Water Board's rate-setting legislative role.

A contractual right to make use of water is far different than a water right acquired by original appropriation, diversion, and application to beneficial use. *City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 60 (Colo.1996). We must give effect to the entire contract, and not view clauses or phrases in isolation. *Kuta v. Joint Dist. No. 50(J)*, 799 P.2d 379, 382 (Colo.1990). Con-

tracts of a governmental entity cannot divest its legislative powers, and contracting parties are charged with knowledge of the retained nature of such authority. *See Keeling v. City of Grand Junction,* 689 P.2d 679, 680 (Colo. App.1984). All of the District contracts expressly incorporate the Denver city charter and provide that in the event of a conflict between language contained in the contract and a provision of the city charter, the city charter "shall supersede."[21] Each contract additionally provides that the Water Board may determine reasonable criteria for allocation of investment and expense applicable to in-city and extraterritorial water service.[22] The trial court found that the Water Board's modified split allocation methodology is an acceptable utility methodology to be employed in setting in-city and extraterritorial rates and ascertaining resultant charges.[23]

■ The trial court was faced with an argument that two District contract provisions constrain the Water Board's rate-making authority. One provision, contained in all of the contracts, states that the rate of return from potable water sales outside the city shall not be greater than six percentage points above the rate of return from potable water sales inside the city.[24] Two of the District contracts contain additional language which provides that charges for extraterritorial use should not exceed 100% of comparable in-city charges.[25] The trial court appropriately construed these provisions in light of the Water Board's retained legislative rate-making authority under the contracts, the charter, and section 31–35–402(1)(f). The court found that the alleged contractual rate limitation provisions set forth a rate spread between in-city and extraterritorial service within which a rate differential would not be deemed to be disproportionate, but these provisions did not

> create a ceiling beyond which a breach of contract automatically occurs. Merely exceeding the 6% and 100% tests in the contract is not a basis for recovery unless the rates established and charged are not rationally related to Denver's obligation under the Charter to recover the full cost of service plus an additional amount.

■ The trial court heard evidence that, to the extent the revised rates and charges exceeded 6% and 100% provisions in District contracts, this occurred as a necessary result

**21.** The District contracts contain the following language:

> This contract is made under and conformable to the provisions of the Charter of the City and County of Denver which control the operations of the Denver Municipal Water System.... Insofar as applicable, said *Charter provisions* are incorporated herein and made a part hereof and *shall supersede any apparently conflicting provision otherwise contained in this contract.*

(Emphasis added) (citations omitted).

**22.** District contracts set forth the following provision:

> The Board shall have reasonable discretion to establish and apply criteria for determining, as to both outside and inside Denver, rate structure, necessary plant, plant value, and operation, maintenance and depreciation expense, provided the application of the criteria shall be made as if there were no differential between charges inside and outside Denver.

**23.** Expert witness Gary Saleba testified that the split allocation method, as utilized by the Water Board to account for growth, is in accord with generally accepted rate-making practices:

> In the 1992 study, Denver Water Board streamlined the allocation of the expansion

facilities to where instead of vintaging the plant, as they had done in the 1989 study, they launched all expansion facilities into one total and split them between inside and outside city based upon 35 years of historical growth and 35 years of prospective growth.

> ....

> ... We—it's our opinion that the split allocation method is a good approximation of growth—for growth on the Denver Water Board, and both the 1990 and '92 studies are in keeping with generally accepted rate-setting practices.

**24.** District contracts provide that:

> The charges under this and other like contracts shall not be deemed to be disproportionately greater to outside users ... if the rate of return (expressed as a percentage) from all the Board's potable water sales outside Denver shall be no more than 6 (percentage points) greater than the rate of return from all the Board's potable water sales in Denver.

**25.** The two Total Service contracts with Littleton and South–East Englewood include the following additional language: "provided, however, outside Denver charges may not exceed comparable inside Denver charges at any time by more than 100%."

in allocating attributable investment and expense and providing a reasonable rate of return on investment in accordance with the city charter. That evidence, which the trial court summarized in its findings, included testimony that the Water Board "could not maintain the 100% differential and comply with the charter" and that other categories of outside-city water users would experience an adverse impact if the 100% limitation were strictly adhered to in favor of entities holding contracts with that provision. Nor was it possible to accomplish strict adherence to the 6% differential. In light of the city charter, a necessary distinction must be made between two broad categories of service, in-city and extraterritorial service. Based on the evidence, the trial court found an 8.3% rate of return from extraterritorial service to be rationally related to Denver's utility requirements.[26]

 That provision of a contract which effectuates the general purpose of the contract is entitled to greater consideration than others which may be alleged to control. *See Las Animas Consol. Canal Co. v. Hinderlider,* 100 Colo. 508, 511, 68 P.2d 564, 566, (1937). We understand why the Districts, in pursuit of the obligations they in turn owe to their constituents, seek to enforce those provisions of the contract which appear to limit the Water Board's rate-setting powers. The City of Littleton's contract with the Water Board, for example, contains both of the allegedly limiting provisions. However, the controlling provision of that contract, as with the remainder of District contracts, is that the "charter provisions are incorporated herein and made a part hereof and shall supersede any apparently conflicting provision otherwise contained in this contract." The continuing essential benefit of the bargain to Littleton of its contract is the avail-

ability to it of Water Board supply, including to areas not already served by Denver water which become a part of Littleton by annexation, in order to serve Littleton growth. As provided in the contract: "those areas which are annexed by Littleton shall automatically become part of the contract service area if not already served by the Board through another Distributor's Contract or otherwise."

The trial court determined that the split allocation method, and the use of incremental past and future growth as a basis for capital cost allocation, was reasonable and consistent with acceptable rate-setting practices. Construing the contracts in light of the evidence, the trial court concluded that the 6% and 100% contractual provisions operate to set forth presumptions of the appropriate spread between in-city rates and extraterritorial rates, but that the Water Board's legislative power under the city charter controlled to overcome this presumption as a resulting consequence of the Water Board's rate inquiry and decision here.

The shifting of rate methodologies by the Water Board over a relatively short period of time, from the 1980s to the 1990s, justifies the Districts' concern about the basis for such reassessment and their consequent participation in the rate-making proceedings. The record discloses, however, that the Water Board's inquiry, reanalysis, and ultimate decision were justified by events which occurred between 1970 and 1992, particularly the increasing percentage of water service provided extraterritorially as compared to in-city use. Although Denver growth might have been expected historically to parallel growth in the Districts, or that the Districts would be annexed into the city qualifying them for in-city rates and charges as the city added to its tax base, the adoption of article XX, section 1, of the Colorado Constitution

26. Expert witness Gary Sabela testified that, utilizing accepted rate-setting practices, an appropriate rate of return from extraterritorial service is 8.3%:

Generally accepted rate-setting practice for outside city customers says that a revenue requirement for outside city customers will equal the sum of operating and maintenance expenses, appreciation and return, where return is the product of rate base and rate of return. The rate of return in this instance should be

equal to the weighted cost of capital for the municipal system. From my review of the '90 and the '92 study, an appropriate rate of return for the Denver Water Board predicated on their average cost of capital was 8.3 percent.

So for that reason, their return of 8.3 percent would be required from outside city customers in order for the appropriate amount of revenues to be derived from outside city services.

(the Poundstone Amendment)[27] curtailed Denver's growth, cutting off additions to its tax base, and led to at least two results which have been manifested in these proceedings. First, because of the annexation restriction, the Districts are not likely to become eligible for in-city rates and will be subject to curtailment in the unexpected event of supply shortage. Second, the percentage of the Water Board's system allocated to the provision of extraterritorial service has continued to increase at a time when new environmental and land use constraints on developing additional supplies have limited the Water Board's ability to serve wholly new areas or increase the security of supply to the Districts presently served.[28] *See Alameda Water & Sanitation Dist. v. Reilly,* 930 F.Supp. 486, 488–89 (D.Colo.1996) (Two Forks permit veto under Clean Water Act); *City of Colorado Springs v. Board of County Comm'rs,*

895 P.2d 1105 (Colo.App.1994) (exercise of authority under Land Use Act and Local Government Land Use Control Act).

The Districts cannot both enjoy the benefits of Denver's supply and successfully oppose having to bear an increasing percentage of the financial burden of the Water Board system allocated by an articulated method for apportionment based on historic and projected growth and reasonable rate of return. This is the policy choice which the Water Board made, and the trial court found this choice to be sufficiently supported by applicable utilities principles. *City of Arvada v. City & County of Denver,* 663 P.2d 611, 615 (Colo.1983) ("The imposition of a development fee on new users is rationally related to the purpose, prominent in modern legislation, of making new development pay its own way.").[29] The Districts did not carry their

**27.** The 1970 census revealed that, for the first time, Denver no longer contained a majority of the metropolitan area's population, its share being reduced to 42%. In 1974 the Poundstone Amendment greatly restricted future Denver annexations. The 1980 census accorded Denver 34.6% of the metropolitan area population. Griffiths & Rubright, *supra,* at 295. Water Board president Farbes testified here that, because of the effect of the "Poundstone Amendment," new plant development primarily benefitted recipients of extraterritorial service and the Board felt constrained to adopt a rate structure which took this into account:

In summary, we concluded first that the board's obligation in providing water outside of Denver was driven and controlled by the 1959 amendment to the charter. That amendment requires that if the board serves water pursuant to a long-term lease outside of the city, it must recover all of the costs associated with the provision of such water and it must recover an additional amount. These circumstances as they affected the conditions and status of the plant in the late 1980s are also affected by this fact, that the City and County of Denver in 1989 and, frankly, for a number of years prior to that alone as its boundaries had been established by the Poundstone Amendment, could easily supply water for in-city residents without developing new plant, and that situation exists today as well.

The citizens of the City and County of Denver can receive water without any new plant development. For that reason, the board, I believe, felt constrained to look at allocation terms, an all new plant capacity development as development primarily and in some instances exclusively for the benefit of entities outside

of the City and County of Denver. Although those entities may, might or might not be occuring [sic] on use basis utilize all of the plant, the development plant and the incurring of the costs associated therewith was only done by the Denver Water Board for the benefit of and for the purpose of serving outside the City and County of Denver.

**28.** The Water Board has been noted for being in the forefront of contingency planning for water, but in recent times has had to limit what it can supply to the suburbs. Griffiths & Rubright, *supra,* at 145.

**29.** In the rate proceedings and in the district court, the Districts advocated the "current use" method of allocating costs. Expert witness Gary Saleba testified that application of such a methodology in the future would not result in growth paying its own way:

Q. All right. The plaintiffs' experts have testified that current use, in their opinion, should be used by the Denver Water Board for cost allocations. Do you have an opinion about whether current use would provide full reimbursement to the Denver Water Board if it were used?
A. Yes.
Q. What is that opinion?
A. My opinion is that given the broad disparity in growth rate between inside and outside city customers and the level of contributed capital from outside city customers, that current use would never result in growth fully paying for growth to the outside city service area.
Q. Mr. Saleba, in your opinion, are the '90 and '92 applications of the split allocation

burden of demonstrating that the rates lack a rational relationship to a legitimate utility purpose.

A municipal utility such as Denver is not permitted to abuse its authority and seek to reap monopoly profits, *see Town of Holyoke v. Smith,* 75 Colo. 286, 296–97, 226 P. 158, 161 (1924), whether from in-boundary or extraterritorial service. Undoubtedly, the Districts, which themselves exercise governmental powers in the arena of rate making and utility service and can seek recourse in legislative and judicial forums, will continue to play a role resistant to abuse of power. Legitimate utility factors, and the justified use of governmental power, must be the basis for decisionmaking, and a judicial remedy is available by way of declaratory judgment action to redress rate-making actions which lack a rational relationship to the utility function of the governmental entity. By adopting a methodology that takes into account thirty-five years of past and prospective growth and reasonable rate of return for capital investment related to extraterritorial service, the Water Board has settled, presumably, on a structure that will remain relatively stable unless unforeseen circumstances intervene.

The trial court findings, because they are based on the evidence, and are supported by an appropriate construction of the District contracts, the city charter, and section 31–

method rationally related to recovery of the full cost of providing service to outside Denver customers?
A. Yes, they are.
Q. Okay. And why?
A. Again, the amount of money that's needed from outside city customers for the amount of money to comport with generally accepted rate-setting practice is the sum of operation and maintenance expenses,. depreciation and deterrents [sic]. The method used in 1990 and '92 resulted in a return of 8.3 percent on rate base from outside city customers, which represents a cost of outside city customers, which is generally—keeping with generally accepted rate practices.

30. C.R.C.P. 54(d) states in relevant part:
Except when express provision therefor is made either in a statute of this state or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs; but *costs against the state of Colorado,*

35–402(1)(f), prevail in this appeal. *See Simpson v. Yale Invs.,* 886 P.2d 689, 698 (Colo.1994).

The court of appeals erred in reversing the trial court's ruling that Denver acted properly in the exercise of its legislative rate-making authority and in remanding the case for additional proceedings based on a proprietary view of rate setting which is not supported by section 31–35–402(1)(f).

## III.

### Costs of Suit

■ The trial court awarded costs of suit in the amount of $192,916.34 to Denver against the Districts without taking into account C.R.C.P. 54(d) [30] as implemented by Chief Justice Directive No. 85–21 dated February 20, 1985. This directive states that courts shall not enter judgments for costs, or assess costs as part of any judgment, against the state *or its political subdivisions.*[31] Under the directive, the expenses involved with and fees authorized in preparing appeals, the record on appeal, or any transcript of evidence or testimony, can be assessed as costs, but not otherwise. We therefore return the case for consideration of a cost award consistent with the directive.

The Districts rely on Rule 54(d), *Lucero v. Charnes,* 44 Colo.App. 73, 75, 607 P.2d 405,

*its officers or agencies, shall be imposed only to the extent permitted by law.*
(Emphasis added.)

31. Chief Justice Directive 85–21 states:
The courts shall waive filing fees for the state,. state agencies, or political subdivisions of the state. *The courts shall not enter judgments for costs or assess costs as part of any judgment against the state, state agencies, or political subdivisions of the state.* The term "costs" does not include the expenses involved or fees authorized in preparing appeals, the record on appeal, or any transcript of evidence or testimony. The state, state agencies, and political subdivisions of the state shall be charged the same fees for preparation of such materials as would be charged to a private litigant.
(Emphasis added.) This directive was preceded by Chief Justice Directive 82–4, dated August 13, 1982, which also stated: "The courts do not assess 'costs' against the state or its agencies or political subdivisions."

407 (1980), and other like cases to resist the award of costs. The Water Board invokes *Lee v. Colorado Department of Health,* 718 P.2d 221 (Colo.1986) and *Rossmiller v. Romero,* 625 P.2d 1029 (Colo.1981) as authority for the award of costs against the Districts in this case. In *Lee* we said that "costs and interest may be included in any judgment entered against a public entity pursuant to the Governmental Immunity Act," as long as the total amount of the judgment does not exceed the recovery limitations set forth in the Act. 718 P.2d at 229. In *Rossmiller* we upheld the award of costs in favor of Denver, 625 P.2d at 1030–31, against a private litigant who was a former employee unsuccessfully challenging his dismissal under C.R.C.P. 106(a)(4), 625 P.2d at 1029–30. Neither case is controlling when political subdivision is matched against political subdivision, as here.

Moreover, Chief Justice Directive No. 85–21 was in effect at the time the costs were awarded, and this directive clearly prevented the trial court from awarding costs against the Districts except as provided in the directive. We view the directive as controlling in this case.[32]

## IV.

Accordingly, we affirm the decision of the court of appeals rejecting the common law public utilities claims of the Districts. We reverse the ruling of the court of appeals which required further proceedings to review Denver's rate-making action. We set aside the trial court's award of costs against the Districts in favor of Denver and remand with directions to award costs under C.R.C.P. 54(d) as implemented by Chief Justice Directive No. 85–21, and for further proceedings consistent with this opinion.

---

**32.** We have examined and reject the Water Board's contention that the Districts did not object timely to the award and bill of costs. To the contrary, the record shows prompt and consistent objection by the Districts to both the award and bill of costs.